**ROBERT HENDRY, Plaintiff**

**v.**

**ARACELIS BERMUDEZ HENDRY, Defendant**

Family No. 106/1977

Territorial Court of the Virgin Islands

Div. of St. Croix at Christiansted

May 5, 1978

JEAN–ROBERT ALFRED, ESQ., St. Croix, V.I., *for plaintiff*

JOSEPH L. COSTELLO, ESQ. (BRYANT, COSTELLO, BURKE & SCOTT), St. Croix, V.I., *for defendant*

SILVERLIGHT, *Judge*

## MEMORANDUM OPINION

This is an action for divorce, instituted by the husband, who appeared personally and through counsel. The wife, who appeared personally and through counsel, has vigorously opposed the divorce, contending that upon the facts adduced at trial and upon the law as enunciated in 16 V.I.C.

§ 104, as amended, the husband has failed to establish "from [the preponderance of] the evidence presented that there has been a breakdown of the marriage relationship to the extent that the legitimate objects of matrimony have been destroyed and there remains no reasonable likelihood that the marriage can be preserved." 16 V.I.C. § 104.

■ From the testimony presented at the trial, this Court concludes that the plaintiff has not proven by the appropriate standard of proof that to any substantial extent the legitimate objects of matrimony have been destroyed. Even assuming that the same had been destroyed, it further concludes there is insufficient proof that there is no reasonable likelihood the marriage can be preserved. During the course of the trial, a strong, continuing subcurrent of mutual love, affection, respect, understanding, sexual fulfillment, concern, emotional support and involvement in the nurture and happiness of their children was readily apparent between the litigants, and evidenced in their testimony and demeanor. As a result, this Court will not grant the relief requested by plaintiff, but will grant the defendant's motion to dismiss the action pursuant to Rule 41(b) F.R.C.P.

Because this Court has determined that a divorce should not be granted in this case, the writer feels some compelling need to set forth the reasons for that decision and the accompanying interpretation of the amended language of 16 V.I.C. § 104 which led to that conclusion.

Although amended since 1973, no court in our jurisdiction has interpreted the new wording of 16 V.I.C. § 104, nor has any court determined whether the new language therein creates a radical departure from the well-established guidelines laid down by the courts under the prior ground of divorce known as incompatibility of temperament. Research has led to an exploration of the history of

the Danish divorce law, continued in these islands through the modern day, and the legislative history of the enactment, as well as case law from this and other jurisdictions that have applied the revised wording, in a search for the true intent of the legislature in its enactment of Act No. 3418, approved and effective April 24, 1973.

The Virgin Islands, due to its control by Denmark through much of its formative history, developed a tradition of law different from that which evolved in the United States. The earliest American divorce laws were based upon the principle of fault, derived from the ancient ecclesiastical law of England, where marriage was a holy sacrament to be broken only by the death of one of the parties, and until recently were founded upon a notion of fault on the part of a guilty spouse by reason of which the innocent and injured spouse could obtain a legal dissolution of the marriage.

In contrast, the early divorce law of the Virgin Islands grew out of a different cultural tradition and a different legal history. After 1770 in Denmark, divorces were granted on new grounds, in part for uncontrollable misfortunes, such as insanity, and in part for "irremediable disharmony in the common life," analogous to the ground of "incompatibility of temperament" which was codified and adopted by the municipalities of St. John and St. Thomas in 1920, following the acquisition of these islands by the United States government.

From 1790 on, divorces began to be granted without distinct legal grounds, most often when the parties had separated, but also where there had been no separation. By 1827, under the law in force in the Danish West Indies, when the parties had lived apart for three years after a separation agreement and both parties desired a dissolution of the marriage and were agreed on the terms of its dissolution, and spiritual and temporal medication had

failed, then a royal consent divorce might be given by the authorities.[1]

At the time the first codes were prepared after the United States acquired these islands, this Danish ground analogous to incompatibility of temperament was in effect, and constituted no radical innovation when codified by the municipalities of St. Thomas and St. John, and St. Croix (1920, 1921 Codes) under the new wording, "incompatibility of temperament." In so doing, the Virgin Islands became the first jurisdiction to adopt by statute incompatibility of temperament as a ground for divorce. The language of the Municipal Codes of 1920 and 1921 was carried over into the divorce law enacted by the Legislative Assembly in 1944 and was continued in effect until the recent amendment in 1973.

The Virgin Islands' "incompatibility of temperament" statute eliminated the necessity of determining which of the parties was at fault. While it required that the dissolution "be declared at the instance of the injured party," the courts early recognized that if there was, in fact, incompatibility of temperament, *both* parties were necessarily injured by their common incompatibility and the question of who was at fault need not be determined. Burch v. Burch, supra, at p. 808.

Prior to 1973, a number of well-reasoned opinions established guidelines for the courts to follow in determining exactly when a divorce should be granted on the grounds of incompatibility of temperament. The accepted and most widely quoted definition is that of Judge Maris:

We conclude that while incompatibility of temperament in the Virgin Islands Divorce Law does not refer to those petty quarrels and minor bickerings which are but the evidence of that frailty which all humanity is heir to, it unquestionably does refer to conflicts in personalities and dispositions so deep as to be irrecon-

---

[1] Burch v. Burch, 2 V.I. 559, 570, 159 F.2d 799, 805 (3rd Cir. 1952), note 9.

cilable and to render it impossible for the parties to continue a normal marital relationship with each other. To use the ancient Danish phrase, the disharmony of the spouses in their common life must be so deep and intense as to be irremediable. It is the legal recognition of the proposition long established in the earlier Danish law of the islands that if the parties are so mismated that their marriage has in fact ended as the result of their hopeless disagreement and discord, the courts should be empowered to terminate it as a matter of law.

Burch v. Burch, supra, at 806–807; Schlesinger v. Schlesinger, 6 V.I. 671, 300 F.2d 7 (3rd Cir. 1968); Colby v. Colby, 6 V.I. 362, 283 F.Supp. 150 (D.C.V.I. 1968); Del Peschio v. Del Peschio, 5 V.I. 461, 356 F.2d 402 (3rd Cir. 1966); Shearer v. Shearer, 5 V.I. 439, 356 F.2d 391 (3rd Cir. 1965), cert. denied, 384 U.S. 940, 86 S.Ct. 1463 (1965).

█ Plaintiff argues that the decades of judicial interpretation and centuries of Island legal tradition were discarded by the legislature when it amended the language of Section 104 by Act No. 3418, supra, and that the ancient structure of our law, extending from Danish times, is but a house of cards, demolished and replaced by a legislative enactment. As a result, plaintiff contends this court is but a legal rubber stamp, compelled to declare a marriage terminated at the whim of either spouse who need only state that he or she wants out, for whatever reason.

This Court is not convinced that the legislature intended so sweeping a change. On the contrary, from the legislative history of the amendment,[2] it appears that no revolutionary change was intended in the concept of incompatibility, for as then Senator Sheen, its sponsor, said in supporting its enactment:

Within the last ten or more years there has been a growing recognition that if a marriage is (sic) in fact been terminated, that is,

---

[2] Legislative History, Bill No. 5836, amending 16 V.I.C. § 104, introduced by Senator Sheen and passed April 24, 1973, as No. 3418, § 1, Sess. L. 1973, p. 45.

factually been terminated, that there should be no legal barriers to effect such termination. *The amendments offered here today really provide no revolutionary concept in our law,* since the Virgin Islands has been rather ahead of most jurisdictions, having the grounds for divorce from incompatibility of temperament. ... The court recognizes that the marriage has in fact been terminated, that there is no hope of reconciliation. However, because of the requirement that the action be brought at the instance of the injured party, the court does not have the ability to legally dissolve the marriage. (Emphasis added.)

Although perhaps inartfully stated, there is a clear indication in the language cited that Senator Sheen, in introducing the new wording, and the legislature in enacting it, intended the court to be satisfied, from the evidence presented, that *both* factors existed (i.e., termination in fact and no hope of reconciliation), before it could grant a decree dissolving the marriage.

Before the amendment in 1973, the Virgin Islands divorce statute had included a mixture of fault and no fault grounds. In practice, the grounds requiring proof of fault of one party were seldom used,[3] the vast majority of litigants preferring to seek a dissolution of their marriages under the enlightened ground in use here since Danish times, that is, mutual incompatibility of temperament. In amending 16 V.I.C. § 104, the legislature merely eliminated entirely those grounds based on fault,[4] all of them being encompassed in the broad language of the amendment, but did not intend thereby to alter the long-established parameters of the concept of incompatibility of temperament.

---

[3] Impotency, adultery, felony conviction, wilful desertion for one year, cruel and inhuman treatment, insanity occurring after marriage, habitual gross drunkenness. (16 V.I.C. § 104, prior to amendment.)

[4] "So therefore, the amendments that have been offered eliminate entirely a concept of fault, provides that if the marriage is (sic) in fact been terminated that there ought not to be a barrier to the termination of that marriage." Legislative History, Bill 5836, supra.

■ A common sense reading of the language of 16 V.I.C. § 104 makes clear that the new wording continues the old concept, "that if the parties are so mismated that their marriage has in fact ended as the result of their hopeless disagreement and discord, the courts should be empowered to terminate it as a matter of law." Burch v. Burch, supra. Such dissolution will be granted not merely because one party states he wants a divorce, but "when *the court* is satisfied from the evidence presented that there has been a breakdown of the marriage relationship . . ." 16 V.I.C. § 104 (emphasis added).

Additional weight is given to this interpretation of the amended language by the treatment of the required proofs which the courts of the Virgin Islands have used in applying 16 V.I.C. § 104. The modified language of the statute seems to have entered into the mainstream of the law without a ripple.[5]

In the only Virgin Islands case disclosed by this Court's research in which the court detailed extensive facts leading to its conclusion that a divorce should be granted pursuant to the language of 16 V.I.C. § 104 as amended, Judge Feuerzeig dealt with a woman who had been involved in extra-marital affairs for over three years, had been separated from her husband for 9 months, had been involved in fights with her spouse in front of the children, "as well as many other incidents." Hodge v. Hodge, supra. The court found that there was sufficient evidence presented to conclude factually that the marriage relationship had broken down to the extent that the legitimate objects of matrimony had been destroyed and there remained no reasonable likelihood that the marriage could be preserved. Here was no rubber stamp legal process, but a full and

---

[5] Todman v. Todman, D.C. Civil No. 76/879 (July 6, 1977); Hodge v. Hodge, D.C. Civil No. 1976/686 (May 5, 1977); Crooks v. Crooks, 12 V.I. 509 (D.C.V.I. 1976); Smith v. Smith, 12 V.I. 512 (D.C.V.I. 1976).

complete hearing at which sufficient evidence was presented to satisfy the court that a breakdown had in fact occurred.

■ Plaintiff, in substance, argues that the new wording of 16 V.I.C. § 104 deprives this Court of its inherent power to find the facts and determine law, and grants these powers to the litigants, either of whom, he argues, by departure from the household effects a termination in fact of that marriage. He relies upon the statement that:

When either spouse finds the marriage intolerable to the point of departure from the household, the marital relationship is factually terminated as each goes his separate way. The divorce is merely the legal rubber stamp which memorializes a terminated marriage and frees the parties to remarry. . . . At the base of the marital relationship is the willingness of the parties to live together. If they are unwilling to do so, for whatever reason or whoever is at fault, the marital relationship is in fact terminated and "the objects of matrimony have been destroyed,".[6]

which he urges renders this court a mere legal rubber stamp to grant the divorce and free the parties to remarry.

■ This Court is not prepared to abdicate so completely its responsibilities to society and to the law. While the amendment to 16 V.I.C. § 104 was borrowed from its Michigan counterpart, this Court is not bound by the ultra-liberal interpretation of its language posited by Michigan attorneys Honigman and Snyder. True, it is a cardinal rule of statutory construction that when the language of a statute has been taken from a statute of another jurisdic-

---

[6] Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, quoting language from Jason L. Honigman, Esq., "What 'No Fault' Means to Divorce," Michigan State Bar Journal, January, 1972, at pages 17–18, and George E. Snyder, Esq., "Divorce Michigan Style—1972 and Beyond," Michigan State Bar Journal, December, 1971, pages 740–45. Snyder, in his article erroneously shifts to the defendant the burden to present the "monumental proof requirements necessary to deny a divorce." (page 743).

tion, it should be construed to mean what the highest court of that jurisdiction had, *prior* to its enactment in the Virgin Islands, construed it to mean. Berkeley v. West Indies Enterprises, Inc., 10 V.I. 619, 480 F.2d 1088 (3rd Cir. 1973); Paiewonsky v. Paiewonsky, 8 V.I. 421, 446 F.2d 178 (3rd Cir. 1971); Williams v. Dowling, 4 V.I. 465, 318 F.2d 642 (3rd Cir. 1963). On the other hand, later decisions of a sister court would be, at best persuasive. Cintron v. Bermudez, 6 V.I. 692 (D.C.V.I. 1968); Iacone v. Cardillo, 208 F.2d 696 (2nd Cir. 1953); Commonwealth of Pa. v. Brown, 260 F.Supp. 323 (E.D. Pa. 1966).

No court in Michigan ever adopted the liberal language of the Honigman article prior to the amendment of 16 V.I.C. § 104 by our legislature,[7] and there is no evidence that the Virgin Islands Legislature intended such a liberal interpretation to apply. The Michigan legislature was writing on a clean slate, as Michigan had never before had "no fault" grounds for divorce and thus had no binding body of law to aid in the interpretation of its new statute. Contrarily, the Virgin Islands has long had "no fault" grounds under "incompatibility of temperament" and in its case law has long recognized the requirement to consider the dual conditions precedent, that is, whether (1) the legitimate objects of matrimony have been destroyed, and (2) there remains no reasonable likelihood that the marriage can be preserved, now specifically stated in 16 V.I.C. § 104. The language from a pre-amendment case appears to be directly on point:

. . . [T]he inquiry is not to the fault of either or both but rather as to whether their marital barque has so far floundered upon the rocks of disharmony and discord *as to be beyond the possibility of salvage.* It is to the question *whether the marriage*

---
[7] See Kretzschmar v. Kretzschmar, 210 N.W.2d 352 (Mich. App. 1973), decided subsequent to Virgin Islands amendment, wherein the article is cited, although the case is further distinguished on its facts.

*is in fact ended because of the basic unsuitability of the spouses for each other*, as shown by the events of their married life, rather than to the causes of the state in which they find themselves, that the court must direct its inquiry. . . ." (Emphasis added.)

Del Peschio v. Del Peschio, supra, at 406.

Let us consider the dual conditions which the court, from the evidence, must find present before a dissolution of a marriage can be granted. First, the breakdown must be to the extent that the legitimate objects of matrimony have been destroyed. The legislature has not specified what the legitimate objects of matrimony are, but a number of possibilities come quickly to mind: bearing and raising children, sexual fulfillment, mutual kindness, affection and respect, emotional support, companionship, home life, common economic goals, and concern for the well-being of each other—the list is endless.[8]

However, those courts which addressed this issue have been unanimous in refusing to lay down guidelines, declaring that to do so would cause parties to attempt to fit themselves into tailor-made categories, rather than allow the court to consider each case individually. Riley v. Riley, 271 So.2d 181 (Fla. App. 1972); Mattson v. Mattson, 376 A.2d 473 (Me. 1977); Flora v. Flora, 337 N.E.2d 846 (Ind. App. 1975); Desrochers v. Desrochers, 347 A.2d 150 (N.H. 1975).

A Colorado court, when faced with the contention of the defendant husband that the divorce decree should recite

---

[8] "Marriage is mutual voluntary compact, springing from sentiment, emotion, affection and parties' desire for sacrifice and surrender to each other, and is properly based on mutual regard and love, suitably ratified, for purposes of living together as husband and wife until death, and constituting a family for preservation of moral and social purity, propagation of children, and their nurture, training and preparation for family welfare and general good of society." Amsterdam v. Amsterdam, 56 N.Y.S.2d 19, 22 (cited in Marriage, 55 C.J.S. § 1). Also see Lefkoff v. Sicro, 6 S.E.2d 687, 692 (Ga. 1939), "Marriage * * * is the civil status of one man and one woman legally united for life, with the rights and duties which, for the establishment of families and multiplication ·and education of the species, are, or from time to time may thereafter be, assigned by the law to matrimony."

the legitimate objectives of a marriage and should further state which goals have been irretrievably broken, refused to do so, stating,

The issue of whether a marriage has been irretrievably broken is a question of fact to be resolved upon consideration of the circumstances of each case, and the factors underlying that determination will necessarily vary from case to case. (Cite omitted.) While we recognize that many married couples share commonly accepted goals of marriage, we may not mandate that every marriage be evaluated by those standards. In Re Marriage of Baier, 561 P.2d 20 (Colo. App. 1977), at 22.

■ This Court will not, therefore, attempt to set forth specific guidelines for identifiable legitimate objects of matrimony that must be destroyed to constitute a breakdown of the marriage relationship. We approve of, and adopt, the language of Judge Johnson of the Florida District Court of Appeals, in Riley v. Riley, supra, at 183, wherein it is said:

Whether or not the marriage is irretrievably broken is left to the trial court's determination based upon the evidence adduced at the hearing. . . . Without attempting to set forth specific guidelines, we think the central inquiry in each situation should be a subjective, rather than an objective one. In other words, observable acts and occurrences in the marriage relationship and the causes of the state in which the parties find themselves are not as important or controlling as the question of whether the marriage is in fact ended because of the basic unsuitability of the spouses for each other and their state of mind toward the relationship.

Having made a determination of whether or not there has been a breakdown of the marriage relationship to the extent that the legitimate objects of matrimony have been destroyed, the court must next ascertain whether there remains any reasonable likelihood that the marriage can be preserved. 16 V.I.C. § 104. The language of the amendment is in the conjunctive, requiring that *both* elements be found present before a divorce may be granted.

623

Considerations of reconciliation and the preservation of the marriage relationship in the Virgin Islands law long preceded the 1973 amendment. As long ago as Burch v. Burch, supra, our courts were referring to irreconcilable and irremediable conflicts and differences. The Third Circuit, by 1966, had directed trial courts to consider the likelihood that the marriage could be preserved in Shearer v. Shearer, supra, at 393, wherein it was said:

The court must, of course, also weigh the possibilities of personal adjustment and reconciliation and the restoration of a normal marital status in determining whether to exercise its discretionary power to grant a divorce upon the ground of incompatibility.

With the passage of the 1973 amendment, what had been judge-made law simply became statutory law.

■ As we have shown, the trial court must make its finding from the evidence presented of reasonable likelihood the marriage can be preserved. Other jurisdictions, with the identical statutes, have dictum to the effect that this second factor is the important issue.[9] Indiana recently enacted the "no fault" grounds for divorce of "irretrievable breakdown of the marriage," with the additional condition precedent that the court find there is no reasonable possibility of reconciliation.[10] The Indiana Court of Appeals has stated:

The key issue for the court's determination is whether there exists a reasonable possibility of reconciliation and the *marriage as a whole* must be considered. From the evidence presented at the hearing, the court must be satisfied that the parties can no longer live together because of difficulties so substantial that no reasonable efforts could reconcile them. . . . [I]t is the marriage relationship as a whole which is at issue, not the specific acts or conduct of the parties. All of the surrounding facts must be in-

---

[9] In Re Marriage of Morgan, 218 N.W.2d 552 (Iowa 1974), at 558.
[10] Indiana Dissolution of Marriage Act, IC 1971, 31-1-11.5-3(a), 8(a), (Burns Code Ed., Supp. 1975).

quired into if the marriage should be dissolved. . . . [T]he crucial issue is whether a reasonable possibility of reconciliation exists. The subjective state of mind of the parties toward their relationship as well as any observable acts or occurrences would be relevant upon this issue. (Emphasis added.)

Flora v. Flora, supra, at 850. We concur with and adopt its statement of the law concerning relevant proofs.

Turning to the case sub judice, upon examination of the evidence presented and consideration of the subjective state of mind of the parties toward their relationship, this court is constrained to conclude that there has been no breakdown of the marriage relationship to the extent that the legitimate objects of matrimony have been substantially destroyed. Furthermore, we hold that there was insufficient evidence adduced to enable this Court to conclude that there remains no reasonable likelihood that the marriage can be preserved.

■ The burden is on the plaintiff to show, by a preponderance of the evidence, that the marriage relationship is broken to the extent that the legitimate objects of matrimony have been destroyed *and* there remains no reasonable likelihood that the marriage can be preserved. We hold that the plaintiff has not met that burden.

In the case at bar, the Hendrys have been married since March, 1971, a period of six years, during which time two children were born. In the succeeding years, they purchased in joint ownership two pieces of residential property, one of which was the marital home, and they continued to live together until approximately six months before this action was instituted. Prior marital discord was dealt with and the problems resolved by the parties to the extent that they were able to continue their marital pursuits.

Plaintiff has, in the past, in an effort to meet the economic needs of his family, operated a laundromat on the

side and presently he is employed as a guidance counsellor of the Department of Education.

There were admittedly conflicts within the home, arguing and bickering centering around the fact that the parties have different personalities—he, an introvert; she, an extrovert and more socially involved. Defendant has recognized these differences and, in an effort to reconcile them, at plaintiff's suggestion, has studied Transcendental Meditation and Yoga. She testified that she has tried to correct her shortcomings, increase their communications and diminish the disagreements between them. Whether these efforts will bear fruit remains to be seen since there has been insufficient time to determine if these sincere efforts on her part will restore their earlier felicity of relations.

Plaintiff left the home 1½ years ago but, other than maintaining a separate apartment, it was for all purposes as if he never left. Plaintiff testified he saw his wife two to three times a week, sometimes ate meals with her and the children,[11] appeared socially with her as husband and wife, had sexual relations with her until the Tuesday before the trial, and desired to maintain the improved friendly relations with her that had occurred since the separation. He ceased sleeping overnight at their home, but not his sexual excursions, and stopped socializing in public with his wife only when he was advised that such behavior would likely be detrimental to the success of his suit for divorce.

Despite his asserted feeling of hostility towards his wife, which allegedly caused him to move out, the record is replete with continued instances revealing the love and concern between the parties. When defendant was hospitalized after the separation, plaintiff attended on her at the hospital, supervised the doctors, paid the bills, and visited

---

[11] Plaintiff testified that if there were no litigation pending, he would prefer to eat "at home."

her at home while she recuperated. During these visits, he expressed his continuing concern and interest for her.

A loving father, plaintiff, while away at school for eight weeks, regularly called the home and spoke with the children. He maintains his visits and close rapport with them. In fact, until plaintiff was advised that such constant involvement with the daily household activities of his wife and family would militate against his divorce suit, defendant could and did testify that they were just like a family—"only plaintiff didn't sleep at home."

The plaintiff has declared that, as a guidance counsellor, he has decided where he is "at," and where he is "at" is that he wants a divorce. His wife has opposite desires. She feels very close to her husband and has urged him to obtain counselling or psychiatric help, in which she is willing to participate, in an effort to help him over what she believes to be a "phase." She professes to be willing to reconcile any differences, testifying that she loves and respects her husband and that he, in turn, is very affectionate to her. She testified that they still have mutual feelings for one another and that they are both very close to the children. Furthermore, plaintiff has supported the family throughout this period and has paid all bills just as if they were still an undivided family.

Applying the law to the facts, this court is not satisfied by a preponderance of the evidence presented that there has been a breakdown of the marriage relationship and, consequently, no divorce will be granted. Perhaps for temporary periods, certain legitimate objects of matrimony have been lost and perhaps some trust has been destroyed, but it cannot be said that, on balance, there remains no reasonable likelihood that the marriage can be preserved.

■ Normally, the absence of the husband from the home for such a period would be strong evidence that the marriage relationship had broken down. However, the hus-

band's continued close interaction in every aspect of home and married life convinces this Court that plaintiff's mind is not irrevocably made up that the marriage is at an end and that no reconciliation is possible. Mere absence from the home is no bar to having a divorce denied.[12]

 The actions of the plaintiff are not the actions of a man who "wants out." The Court will not put the force of law on the fleeting passion of a middle-aged man to again "be free," when his every action evidences his continuing love and dependency on his home and his relationship there with his wife. As recognized in Riley v. Riley, supra, at 185:

> Marriages are durable. They break, of course. But not all breaks are beyond repair. Especially when only one spouse wants out and the other is willing to reconcile upon passage of the temporary diversion which caused the rift. . . . Appellant's effort to turn his back on the woman who ministered to his needs for some 40 years should not be assisted by this court. The mere absence of roman candles or champagne and strawberries for breakfast in the twilight years of a marriage is not proof that the marriage should be dissolved.

The divorce is denied, defendant's motion for involuntary dismissal is granted, and a decree conforming to this opinion, to be submitted by counsel for the defendant, shall enter.

---

[12] Schlesinger v. Schlesinger, supra (Divorce denied, separation 1½ years before trial); Shearer v. Shearer, supra (Divorce denied, separated 7 years before trial).