14435

*IN RE:* NIGHTINGALE'S ESTATE
*IN RE:* LEAGUE *ET AL.*

(189 S. E., 890)

528

*Mr. B. F. Martin,* for appellants,

*Messrs. Mann & Arnold* and *Jester & Wooten,* for respondents,

February 10, 1937.

The opinion of the Court was delivered by Mr. Justice Baker.

On March 17, 1934, Miss Irene S. Nightingale, well advanced in years, died in Greenville, S. C., at the home of Mr. and Mrs. T. J. League, where she had resided since June 5, 1930. She was a sick woman from said June 5, 1930, to October 30, 1930, when she fell and broke her hip, and from then was a semi-invalid, growing progressively worse,

until on or about May 24, 1932, she became a complete invalid, absolutely helpless, and in this physical condition remained to the date death came as a relief to her, and to remove an almost unbearable burden from Mr. and Mrs. League. Mrs. League is the sister of Miss Nightingale, and by chance was appropriately christened "Florence."

During the time Miss Nightingale was in the home of the Leagues, appellants in this case, she paid board, in the beginning at $7.00 per week, but within a short period of time increased it to $11.00 per week. She, in addition to this, made substantial gifts of money to her sister, Mrs. League, from time to time. Miss Nightingale was allowed to remain in the home of appellants for the reasons: she was the sister of Mrs. League; she required constant and continuous waiting upon, and from the spring of 1932 was totally dependent upon others. She had, if not outright, then, in effect, been denied entrance, even as a paying boarder, to the homes of her brothers, the objectors-respondents, in this case, and had no other place to go, unless to a hospital or "Home," the contemplation of which made Miss Nightingale very unhappy, and would probably have consumed such property as she owned long before her death.

The appellants are an elderly couple, Mr. League being seventy-three and Mrs. League seventy-one years of age. They kept no servants, were not financially able to do so, and Mrs. League did all of the house work, cooking, etc., and the "duty" of nursing and caring for Miss Nightingale fell upon Mr. League. In fact, for some of the most unpleasant services necessary to be performed for Miss Nightingale, Mrs. League was not physically able to perform, and all proprieties had to be dispensed with, and Mr. League assumed almost entire charge of Miss Nightingale, requiring a twenty-four hour service for almost two years prior to her death.

Miss Nightingale was a lady of unusual intelligence and refinement. She taught forty-one years in Massachusetts,

twenty-nine years of them in Boston, being a teacher of physics in a high school that was a part of the Greater Boston School System.

During the period of time appellants were caring for Miss Nightingale, the objectors-respondents were most complimentary of them, and expressed their regrets that they were thus burdened, but at no time do we find respondents willing to share the "burden," nor showing any signs of brotherly affection for or interest in their sister, Miss Nightingale, until after her death and when the claim under consideration threatened to reduce considerably the amount to which respondents are entitled under the will of their deceased sister. The respondent J. A. Nightingale did not attend the trial of this case, and took no interest in it. His corespondent, the Reverend Chas. S. Nightingale, took a most active interest in attempting to defeat the claim of Mr. League.

This proceeding had as its purpose the cancellation of the following memorandum of agreement:

"This memorandum made and signed by the undersigned on this the 6th day of January, 1934, is as follows:

"Because of the serious financial depression resulting in great depreciation of most of my investments, I have been unable to properly recompense my brother-in-law, T. J. League, for long and faithful services to me during my protracted illness, said services including constant day and night nursing and personal care and attendance upon me since May 24th, 1932,— and, I therefore consider it proper that I should make memorandum of my intention and agreement with him for such services.

"I understand and agree that he shall be paid from my estate at my death, in preference to all legacies whatsoever, a sum to be determined at the rate of thirty dollars ($30.00) per week from May 24th, 1932, to date of my death, it being understood between us that this compensation covers all services referred to including such incidentals as medicine, bandages, laundry, disinfectants and medical supplies of any

kind, but does not include board or anything else which has been used for my comfort and necessities, or any other thing whatsoever. There are no credits of any kind to be placed against this obligation.

"Witness my hand and seal the year and day above written in the presence of two witnesses.

"Witness:                      "[Signed] Irene S. Nightingale.

"Dela R. Moffett,
"H. C. Williams."

The will of Miss Irene S. Nightingale, omitting the formal portions, is as follows:

"Item 1. I bequeathe to my sister, Florence N. League, all my clothing, beads, and jewelry; also a legacy of Two Thousand Dollars ($2,000.00).

"Item 2. All the rest and residue of my property and rights of every kind I will devise and bequeathe to my brother, Joseph A. Nightingale, of Louisville, Kentucky, my brother, Charles S. Nightingale, of Carlton, Massachusetts, and my sister, Florence N. League, of Greenville, South Carolina, to be divided equally among them.

"Item 3. I hereby appoint my sister, Florence N. League as executrix of this will."

A codicil thereto, omitting the formal portion, is as follows:

"Item I. I will and direct that my Executrix, Florence N. League, be not required to give bond.

"Item II. I bequeath to my brother, J. Samuel Nightingale, the sum of One Hundred Dollars ($100.00) if he be living at my death; if not, then this bequest to lapse and be of no effect.

"Item III. If at the time of my death my brother, Joseph A. Nightingale shall not have paid me the sum of five hundred dollars borrowed for six months, May 15th, 1931, and also shall not have returned to me the Italian Bond T. M. 15977, face value one thousand dollars ($1,000.00), which

I gave him in the Autumn of 1929 for value received and future care, which conditions he did not fulfill, then these two sums with interest due shall be deducted from the bequests made him by my said will and codicil."

After the death of Miss Nightingale, and the probating of her will in common form, and Mrs. League qualifying as executrix of the will, Mr. League filed with the executrix and with the Probate Judge his claim for services, etc., at the rate of $30.00 per week from May 24, 1932, to the date of the death of Miss Nightingale, March 17, 1934, based upon the written agreement above set out. Shortly after the filing of this claim, respondents through their attorneys filed general objections to the claim.

Thereafter, Florence N. League, individually and as executrix of the estate of Irene S. Nightingale, deceased, and T. J. League, as petitioners, filed their verified petition in the Probate Court on March 7, 1935, praying that a rule to show cause be served upon the attorneys for the objectors for them to show cause, if any they have, why the claim of T. J. League should not be paid. Attached to this rule was an amended proof of the claim of T. J. League and also a copy of the agreement.

The amended claim was based on the written contract, and was for personal services from May 24, 1932, to March 17, 1934, including incidentals, medicine, bandages, laundry, disinfectants, and medical supplies, at $30.00 per week, amounting to $2,850,00, and interest thereon from March 17, 1934, at 6 per cent., the legal rate. The affidavit in proof of the claim set forth that it was correct, due, and wholly unpaid, "and that the said services, incidentals, etc., were well worth the amount claimed."

In due time the respondents herein (objectors in the Probate Court), through their attorneys, filed separate returns to the petition, both of which in substance were the same, alleging that the contract and agreement was not her contract and agreement, and was procured by appellants

(petitioners) through fraud and duress; that the amount claimed was unreasonable; and that Miss Nightingale had furnished the funds for the maintenance of appellants (petitioners), and they should account for such support and maintenance.

Upon the issues thus raised, a hearing was had before the Probate Judge, and testimony taken. The Probate Judge on August 17, 1935, filed his order and decree sustaining the claim and found for petitioners.

Thereafter, and within due time, both objectors served notice of intention to appeal from the decree of Judge Gullick to the Court of Common Pleas for Greenville County upon certain specified grounds.

Thereafter, and within due time, attorneys for the objectors served notice that at the proper time they would move the Court to frame certain issues of fact to be submitted to the jury.

The attorney for the petitioner thereafter served notice of the two issues which he wished submitted to the jury, without waiving his rights.

On February 5, 1936, the attorneys on both sides argued before his Honor, Judge A. L. Gaston, the matter of the Court framing and sending issues to the jury, the objectors contending that their five proposed issues should be submitted, and the attorney representing the petitioners contending that if any issues be sent to the jury his two proposed issues be submitted. On the same date Judge Gaston handed down his order wherein he set forth the three questions or issues to be submitted to the jury, and no notice of intention to appeal from said order was served within ten days from the notice of the filing of said order.

The three issues submitted to the jury were as follows:

1. Did Irene S. Nightingale, on January 6, 1934, have sufficient mental capacity to execute the alleged agreement between herself and T. J. League, which is the basis of this action?

2. Was the alleged agreement of Irene S. Nightingale bearing date of January 6, 1934, to T. J. League obtained by the said T. J. League and Florence N. League by fraud?

3. Was the alleged agreement of Irene S. Nightingale bearing date of January 6, 1934, to T. J. League obtained by the said T. J. League and Florence N. League by duress?

The matter was then heard on its merits before Judge Gaston and a jury, and the jury on February 14, 1936, returned their verdict in which all three of the questions or issues submitted to them were answered in favor of the objectors and against the petitioners.

Following the verdict of the jury, petitioners (appellants in this Court) moved before Judge Gaston to set aside the verdict of the jury and to find in favor of petitioners. Petitioners also asked the Court to pass "on the issues of *quantum meruit* and all the other issues properly before the Court in this case," but under the conclusion reached by this Court, it is unnecessary to mention further the issue or question of *quantum meruit*.

After hearing argument, Judge Gaston passed a decree on March 9, 1936, overruling the motion and concurring in the verdict of the jury on the issues of fact submitted to it.

Appellant has a number of exceptions to the decree of Judge Gaston, but under our view of the case, it is unnecessary to discuss but three questions, viz.:

1. Was there error in finding mental incapacity in this case and in not setting aside or disregarding the verdict of the jury on this issue, upon the ground that there was no evidence to sustain the charge of mental incapacity, no evidence of mental incapacity "at the time" of the execution of the written agreement, nor at any other time; the verdict being merely advisory?

2. Was there error in finding fraud in this case and in not setting aside or disregarding the verdict of the jury on this issue, upon the ground that there was no evidence to sustain the "objection" of fraud, no evidence that the agree-

ment was obtained by fraud "at the time" of the execution of the written agreement, nor evidence of fraud at any other time, said verdict being merely advisory?

3. Was there error in finding "duress" in this case and in not setting aside or disregarding the verdict of the jury on this issue, upon the ground that there was no evidence to sustain the "objection" of "duress", no evidence of any unlawful restraint or any threats whatever "at the time" of the execution of the written agreement, nor at any other time; and the verdict being merely advisory?

Respondents take the position that this is a law case, and that appellants having failed to make a motion for a nonsuit or a motion to direct a verdict, on the ground that there is no evidence or an insufficiency of evidence to support the finding of the jury, then this Court is precluded from reviewing the evidence or considering the exceptions on that ground; and cite Rule 76 of the Circuit Court; *State v. Bowman,* 137 S. C., 364, 135 S. E., 360; *E. F. A. Weiters & Sons v. Davis,* 181 S. C., 522, 188 S. E., 241.

This was a proceeding tried first in the Probate Court, and on appeal by respondents, tried *de novo* in the Court of Common Pleas. The purpose of the proceeding was for the cancellation of a written instrument on the grounds of mental incapacity to enter into a contract, and the procurement thereof by fraud and duress, a strictly equitable proceeding. The respondents proceeded throughout as though it was a proceeding on the equity side of the Court, making a motion for the submission of issues to a jury, and the trial Judge made his decree on the same theory, specifically concurring in the finding of the jury. The respondents were not entitled to have issues submitted to a jury as a matter of right, but it was discreationary with the trial Judge to submit issues.

In respondents' brief, there appears the following: "Incidentally, we might call to the Court's attention, the provisions of Article 5, Paragraph 4 of the 1895

Constitution of this State, and in connection therewith Section 593 of the 1932 Code."

We assume therefrom that it is the position of respondents that under the sixth paragraph of Section 593, the trial Judge was compelled to concur in the findings of fact by the jury on the issues submitted or grant a new trial; that he could not disregard such findings by a jury and write a decree ignoring or disagreeing with same; and that where the trial Judge concurs in the findings of the jury, this Court cannot review the finding of fact, but is confined on appeal to the correction of errors of law.

There is nothing in the record from which it could be said that respondents were proceeding under Section 593 of the Code in moving for issues to be submitted to a jury, and this section is not exclusive. Under the case of *Hammond v. Foreman,* 43 S. C., 264, 21 S. E., 3, 4, we hold that where issues are submitted to a jury for the enlightenment of the conscience of the Court, the trial Judge is not bound by the finding of the jury on such issues.

We quote rather copiously from the opinion in *Hammond v. Foreman, supra:*

"It seems that this action, which was on the equity side of the Court of Common Pleas, had been placed on its appropriate calendar, No. 2. The defendant, in his answer, raised a question of fact, and, desiring an issue framed to try the same, gave a notice in writing that he would move the Court on the first day of its session to frame such issues of fact for trial by jury. Neither counsel for plaintiff nor defendant happened to be present in Court when his Honor, Judge Norton, called for issues, as required by the Act of 1890 (20 St. at Large, 695) ; but subsequently, and before the juries for the term had been discharged, the counsel for defendant called up his motion. The order was objected to, because not in time, under the Act of 1890, *supra.* The Circuit Judge, as a chancellor, when the cause was reached on

the call of calendar No. 2, passed an order reciting that defendant was not entitled to his order under the above act, but held and announced that questions of fraud in an equitable action are peculiarly appropriate to a jury trial for the enlightenment of the Court, and settled these issues for trial before a jury. The plaintiff, conceiving that the Act of 1890 was exhaustive as to the mode by which trial by jury of issues of fact in an equitable action may be had, appealed from such order of the Circuit Judge, and his six grounds of appeal present this question in its several phases.

"The defendant assails the appellant's right of appeal. Clearly the appellant has no right of appeal at this time, unless the order in question involves the merits, or, if renounced, will lead to a denial by the Court of some substantial legal right of the appellant here. This would be the case if this Court should hold that the Act of 1890, *supra,* deprived a chancellor of the power of submitting issues to a jury whenever, in his judgment, such a course was necessary to the enlightenment of the conscience of the Court. For this Court to adopt such a view of the effect of the Act in question would work a radical change in the machinery of the Court of equity as it has existed from time immemorial. We cannot view this Act of 1890 as intended for such a purpose, or as working out such a result. If we did, we would not hesitate to declare it unconstitutional, as subversive of the provisions of the constitution relating to Courts of Common Pleas and this Court in equitable actions. This last course is not necessary in the view of this Court."

We recognize and give full effect to Article 5, Section 4, of the Constitution of 1895, but we are confronted with the question in this case, under the exceptions being considered, not of the sufficiency of the evidence, but if there was any evidence of mental incapacity on the part of Miss Nightingale, and of the contract having been procured from her through fraud or by duress. The

question of evidence or no evidence is a question of law. See *Hubbard v. Hollis,* 107 S. C., 325, 92 S. E., 1040; *Bushardt v. United Investment Co.,* 121 S. C., 324, 113 S. E., 637, 35 A. L. R., 637; *Miles v. Record Publishing Co.,* 134 S. C., 462, 133 S. E., 99, 45 A. L. R., 1112.

As to question 1, it is indispensable that the testimony relating to the issue of mental incapacity be briefly stated. Mrs. Delia Moffett testified that she was a witness to the agreement; that on the day the agreement was executed by the deceased, there was nothing to indicate that the deceased was in the slightest way mentally deranged; but, on the contrary, appeared to be mentally normal in every respect and they engaged in a social conversation. Mrs. Williams testified that she witnessed the execution of said agreement and that the mental condition of the deceased was perfect. Dr. Warren White testified that the deceased was afflicted with a nerve disease which would not affect her thinking power; that she was considered by him to be a woman of above average intelligence; and that until the last he felt that mentally she was within normal limits. Dr. John Fewell testified that the affliction of the deceased was a nerve disorder and not a nervous trouble and would not affect her mental condition.

In addition to the above, Mrs. W. W. Willett, neighbor, friend, and former head nurse of Dr. Steedley's Hospital, testified that Miss Nightingale was interested in all things and that she liked to have children come in and took a great interest in them and in music and literature, and up to the time of her death continued interested in those things; Mrs. T. J. Goggins, a graduate nurse, testified that she went to see Miss Nightingale as often as she possibly could; that Miss Nightingale was a most intelligent woman, and regardless of her illness it had not affected her mental capacity in any manner whatsoever, that she never had any doubt about her being normal mentally. Mrs. W. B. Cox, a neighbor and friend, testified that she visited Miss Nightingale

for her own pleasure, and that Miss Nightingale was above the average in intelligence. Dr. Robert A. Brown, an optometrist, testified that Miss Nightingale was much above the average in culture and intelligence.

There is an abundance of testimony supporting the view that the deceased, Irene S. Nightingale, was not mentally incapacitated, but we fail to find any evidence whatever disclosing that the deceased was even slightly deranged mentally at the time this contract was executed.

In the case of *Baymard v. Ulmer et al.,* 153 S. C., 100, 150 S. E., 610, 611, this Court quoted with approval from the case of *DuBose v. Kell,* 90 S. C., 196, 207, 71 S. E., 371, 376, as follows:

" 'Considering first the question as to the mental capacity of the grantor, the rule of law with reference to this matter may be stated in general terms to be that, while the mental incapacity which will render one unable to make a contract or a valid gift need not be so great as entirely to dethrone the reasoning powers, there must be at the time of the act or contract such insanity or mental weakness or unsoundness as amounts to an incapacity or occasions an inability to understand or conprehend the subject of the contract or act and its nature and probable consequences, in order to render the act or contract void in law. 22 Cyc., 1206; *Rippy v. Gant* (4 Ired. Eq.), 39 N. C., 443; *Miller v. Craig,* 36 Ill., 109; *Dennett v. Dennett,* 44 N. H., 531, 84 Am. Dec., 97; *Hay v. Miller,* 48 Neb., 156, 66 N. W., 1115; *Dewey v. Allgire,* 37 Neb., 6, 55 N. W., 276, 40 Am. St. Rep., 468; *West v. Douglas,* 145 Ill., 164, 34 N. E., 141; *Argo v. Coffin,* 142 Ill., 368, 32 N. E., 679, 34 Am. St. Rep., 86; *Mann v. Bank,* 86 F., 51, 29 C. C. A., 547.'

"In the same case, the Court says further on page 208 of 90 S. C., 71, S. E., 376:

" 'In order to render a deed void upon the ground of the mental incapacity of the grantor, it must appear that there was on his or her part such mental infirmity as to render

him or her incapable of understanding the nature of the act. The test is not whether the grantor's mental powers were impaired, but whether, at the very time of the execution of the deed, he had sufficient capacity to understand in a reasonble manner the nature and effect of the act which he was performing. Mere infirmity of mind or body, not amounting to an incapacity to understand the nature and consequence of the act done, will not render a person incapable of executing a valid deed. Nor will monomania or delusion existing in the mind of the grantor affect the validity of a deed, unless it be such as to actually influence his mind in the very transaction in question by rendering him incapable of appreciating the true nature and effect of the particular act in controversy.' (And authorities cited.)

" 'As is said in *Rowland v. Sullivan,* 4 Desaus. [518], 520, there must be made to appear "some incompetency of mind, showing an incapacity at the moment of executing the deed or will, or some imposition practiced upon the testator or donor must be proved, to authorize the Court to exercise the high power of setting aside deeds or wills regularly executed." ' "

Although a physical infirmity may exist in the body of a person or a mere infirmity of mind, if it does not amount to an incapacity to understand, at the time of the execution of a contract, the nature of the act done and the effect thereof, it does not render a person incapable of executing a valid and binding contract.

We find no evidence tending to show that Irene S. Nightingale did not have the mental capacity to enter into a contract at the time she made the contract with T. J. League.

On the second question, that is, if the contract was fraudulently procured, the trial Judge charged the jury that fraud or deceit is composed of several essential elements and that the essential or material elements of fraud required to sustain an action based on fraud are that representations were made as a statement of fact which were

untrue and known to be untrue by the party making them or were recklessly made without regard to the truth of the statements and that such statements were made with intent to cheat and defraud or deceive the other party, and for the purpose of inducing the other party to act upon such false statements, and, further, that such party had in effect relied on such statements and was induced thereby to act to his injury or damage. That all of those ingredients must be found to exist, and the absence of either of them would be fatal to a charge of fraud. There was no appeal from the charge of the presiding Judge, and his charge as to what constitutes fraud becomes the law of this case, assuming that in writing his decree concurring in the finding of the jury, these were the elements he considered.

The recent case of *Waring v. South Carolina Power Co.,* 177 S. C., 295, 181 S. E., 1, goes very fully into the question of actionable fraud, but it is unnecessary to quote therefrom.

In the case of *Border State Lumber Company v. Edwards,* 103 S. C., 391, on page 395, 88 S. E., 537, 538, it is stated:

"No human being can look into the heart and mind of another and discover what of good or evil may be there. Neither do the words of men always disclose the promptings of the inner self. Common experience has taught us that the surest index to the intents, motives, and purposes of men are their acts fairly and impartially judged, in the light of their surrounding circumstances. *No act is to be construed as evidencing an evil intent if it may be fairly construed otherwise.*" (Italics added.)

We have searched the record carefully and are unable to find that appellants made any representations as statements of fact which were untrue, or made any reckless statement of facts, with intent to cheat and defraud or deceive Miss Nightingale; and, of course, if no such statements were made, then she could not have relied upon same or been

thereby induced to act to her injury or damage. In other words, the record fails to disclose a scintilla of evidence of fraud on the part of either Mr. and Mrs. League, and no such evidence has been pointed out by respondents. It is true that appellants received from Miss Nightingale payment for board, and that they accepted gifts in the form of money from her, but there is not the slightest evidence of dishonesty on their part, and even after the trial of this case on circuit, the respondent, J. A. Nightingale wrote Mrs. League that he never questioned and didn't intend to question her honesty.

It was well stated in the case of *Border State Lumber Company v. Edwards, supra,* that "no act is to be construed as evidencing an evil intent if it may be fairly construed otherwise."

The appellants in this case were at the time they are charged with fraudulently procuring the contract in question, over seventy years of age. They have always led exemplary lives, and had reached the age when they should have been able to live leisurely. They did not undertake to induce Miss Nightingale to live with them, but, on the other hand, she begged to be allowed to do so, and out of the goodness of their hearts they took care of her under the most trying circumstances, and when the respondents in this case had closed the doors of their homes to her. It was the most natural thing for Miss Nightingale to want to see Mr. League paid for his services, which were described by the Probate Judge for Greenville County as "exceedingly exacting, onerous, exhausting and unpleasant," and the mere fact that she had paid board, had made presents of money to Mrs. League, and had left Mrs. League an additional legacy of $2,000 over that which she had willed respondents, cannot be considered evidence that a contract, agreeing to compensate Mr. League for his services, was fraudulently procured from her.

This Court is unwilling on the record in this case, where there is an utter lack of testimony to substantiate it, to put the stamp of fraud upon this elderly couple.

As to the third question, that is, was the contract procured through duress, we will first consider the essentials of duress. The attorney for appellants has apparently stated correctly the essentials, which are: (1) Coercion; (2) putting a person in such fear that he is "bereft" of the quality of mind essential to the making of a contract; and (3) that the contract was thereby obtained.

Of course, the most common form of duress is by imprisonment, and another common form of duress is threats to do violence to a person or to refrain from doing something for them, and thereby obtaining something of value.

. In 14 Cyc., 1123, it is stated that duress is "a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or form a contract not of his own volition."

The conditions surrounding the parties to this contract at the time of its execution have hereinbefore been fully set forth, and it is unnecessary to again repeat these conditions except to call attention to the fact that at the time of the execution of this paper, Miss Nightingale's physical condition was such that she was unable to exercise the powers of mobility.

The occurrences relied upon by respondents to prove duress, although particularly set out in printed brief under the subhead "as to fraud," are the following:

That at some time prior to the signing of the contract, Miss Nightingale would call appellants during the night requesting that they come to her bed and change her position, and that on one occasion they refused to come, although she called out over a period of two hours or more, stating that she would smother if her head was not moved. This was

prior to the time that she had lost all power of mobility and it is shown conclusively by the record that appellants were acting as they thought, for the best interest of Miss Nightingale. Another instance referred to is that appallants refused to feed the deceased at times, although they were aware that if she could feed herself at all it was with the greatest difficulty. The record discloses that they were advised by physicians to make her use her hands and that the refusal to feed her at the time they did was to her best interest. That appellants failed and refused for several days to give Miss Nightingale a box of candy, a Christmas present from her brother Joe (J. A. Nightingale, one of the respondents). In the first place, this occurred at Christmas time, 1933, and before the contract was entered into, she had been given the candy, and in the second place, the refusal to open and give her the candy in the beginning was because of the manner the donor had acted with reference to some interest due Miss Nightingale and his refusal to account concerning an Italian bond dividend, and when appellants' action was reported to C. S. Nightingale, the corespondent in this case, he suggested that the package should be wrapped and returned—to J. A. Nightingale—that he would have sent it back. However, Miss Nightingale had been given the package before his advice was received. That appellants refused to let Miss Nightingale lie on another bed. This refusal occurred when her room was being given a thorough cleaning. Probably Miss Nightingale would have been more comfortable had she been carried to another room and bed, but other than that, she suffered no injury. Again it is said that Mrs. League scolded Miss Nightingale on occasions, but the record discloses that it was absolutely necessary to on occasions deal sternly with this good woman, and certainly she did not suffer or lack for proper care. The best evidence of the remarkable care which was taken of her was the fact that bedridden as she was, she developed but one bed sore, and that was promptly healed. We here quote from

the testimony of the undertaker who handled the body of Miss Nightingale following her death:

"Am an undertaker here; I prepared the body of Miss Nightingale for cremation. The conditions of bodies after 2 or 3 or 4 years of bedridden illness all depends on the care they have had, but as a rule where they have been sick a long time we usually find them in bad shape. Where a person is sick a good deal it is mighty hard to take very good care of them, and unless you give them a lot of attention you find bodies in bad shape sometime, bad sanitary conditions. Usually where they have been sick for a long time you find bed sores on some cases, not all. I had my particular attention drawn to this case; I found her in very good condition, no bed sores, the linen was all clean and her body was clean, perfectly clean, and in good condition."

Under the common law, there were two types of ▮▮▮▮ duress recognized, to wit, duress by imprisonment and duress *per minas*. Of course, it is obvious that in the case at bar we are only concerned with the second type above named. At common law, duress *per minas* was considered to exist only when a person was threatened with loss of limb, loss of life, serious bodily injury or imprisonment, and the danger must have been so imminent as to cause a courageous man to perform an act not dictated by his own free will. However, there has been a relaxation of this stern rule of the common law by the Courts of equity and at present the rule is that whether or not duress exists in a particular case is a question of fact to be determined according to the circumstances of each case, such as the age, sex, and capacity of the party influenced. The fear which makes it impossible for a person to exercise his own free will is not so much to be tested by the means employed to accomplish the act, as by the state of mind produced by the means invoked. If one of the parties to an agreement is in a position to dictate its terms to such an extent as to substitute his will for the will of the other party thereto, it is

not a mutual, voluntary agreement, but becomes an agreement emanating entirely from his own mind.

Applying the legal principles as to what constitutes duress to the facts of the case at bar, we are unable to find that there is any evidence of duress, especially in view of the testimony of Mrs. Delia R. Moffett, a witness to the contract, that Miss Nightingale, following the execution of the paper, seemed pleased that it was finished, and the testimony of the other witness, Mrs. Hanna C. Williams, that she read the paper very carefully to Miss Nightingale and that she told her that was what she wanted, and that after the execution of the paper she remained several minutes and they carried on a pleasant social conversation. These witnesses were not strangers to Miss Nightingale, but were her friends and would certainly have detected some restraint in her manner if she was signing this contract under duress.

This Court has had the advantage of the complete record where it could be thoroughly studied, quite an advantage over the able and conscientious trial Judge, who presided at the trial. There was objection after objection to testimony and heated arguments on the part of counsel engaged in the trial, sufficient to cause the trial Judge to lose sight of a great deal of the testimony, especially through a long four-day trial, when he was "on his toes" so to speak, throughout the trial in ruling on the various legal questions arising, and when we find, as we have, that there is no testimony to support either the charge of mental incapacity, fraud, or duress, it is no reflection upon the trial Judge.

It is the judgment of this Court that the case be reversed and remanded to the Circuit Court for entry of judgment in favor of appellants, and for such further orders as may be necessary to carry out the conclusions herein reached.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES CARTER, BONHAM and FISHBURNE concur.