2145

WILLMS TRUCKING COMPANY, INC., Plaintiff v. JW CONSTRUC-TION CO., INC., L-C Partners, A South Carolina General Partnership, Citadel Management Corporation, a General Partner, and Laurel Storage Corporation, OF WHOM L-C Partners, a South Carolina General Partnership, Laurel Storage Corporation and Citadel Management Corporation are, Appellants, and JW Construction Co., Inc., is Respondent. Appeal of L-C PARTNERS.

(442 S.E. (2d) 197)

Court of Appeals

*Fred Thompson, III,* of *Scardato & Thompson,* Charleston, *for appellants.*

*Kerry W. Koon,* Charleston, *for respondent.*

Heard Dec. 9, 1993.

Decided Mar. 7, 1994. Reh. Den. Apr. 21, 1994.

CONNOR, Judge:

L-C Partners, Laurel Storage Corporation and Citadel Management Corporation (collectively referred to as L-C) appeal from an order of the special referee holding them liable to JW Construction Co. for amounts due under a construction contract. We affirm.

Both parties agree this is an action at law. Hence, our review is limited to a determination of whether there is any evidence reasonably tending to support the special referee's findings. *Miller v. Leaird,* 307 S.C. 56, 413 S.E. (2d) 841 (1992). *See also Varn v. South Carolina Dep't of Highways & Pub. Transp.,* — S.C. —, 428 S.E. (2d) 895 (Ct. App. 1993) (in an action at law tried by a special referee, the referee's findings must be accepted unless the evidence is reasonably susceptible of only the opposite conclusion).

Citadel Management and Laurel Storage formed L-C partners to develop a mini-warehouse facility in Summerville, South Carolina. In March 1988, L-C solicited bids for various phases of construction for the facility. JW, by its owner John C. Wilkins, submitted a bid to perform the excavation, backfill, and grading of a portion of the project for $110,000. L-C accepted JW's bid and the parties entered into a written contract for the work.

JW began work shortly thereafter, but had to stop when a bulldozer sank into the soil. The parties discovered that the

property contained organic soil which was unsuitable for the proposed project. Although soil tests performed on the site revealed the condition of the property, no one from L-C took note of the test results prior to entering into the contract with JW.

The parties determined the organic soil would have to be removed and replaced with suitable soil. This is known as "muck and fill" work.[2] Because the original contract did not provide for muck and fill work, the parties agreed to a change order. The change order was executed in June 1988, and provided in part:

1. We will pay for in-place yards at $9.50/yard plus that percentage of shrinkage which will be determined by our soil consultants in Columbia. Each test will take place at your pit and at the site after compaction.
2. Calculations will be based upon the original survey.
3. A soil representative from Foundation and Materials Engineers will be on site to determine the extent of the removal.
4. The quantity will be determined by qualified surveyors. You are welcome to engage your own surveyor to recheck the findings; however, you will be responsible for the cost of the recheck.

While negotiating the change order, Albert Heyward, a Citadel Management representative, refused to use "truck counts"[3] to determine the amount of material replaced. Instead, the parties agreed to use a survey method.

When JW began the muck and fill work, however, L-C did not provide an on-site soil representative as required by the change order. JW completed the muck and fill work in fourteen days. During this fourteen-day period, L-C's surveyor was on the site only three times.

Wilkins contacted Heyward and Jerry Phillips, another Citadel Management representative, to let them know the soil representative was not on the site. Wilkins was told to keep

---

[2] *See Clarke v. Walker*, 25 Tenn. App. 78, 150 S.W. (2d) 1082 (1941) ("muck" is defined as earth to be, or being, excavated).

[3] "Truck counts" refers to a method of calculating the volume of material moved by tallying load tickets, which are issued each time a truck transports a load.

working and "was assured that it would be worked out." Because L-C's soil representative was not monitoring the work, Wilkins counted the load tickets from the trucks each night to verify the number of loads.

A dispute arose over payment for the muck and fill work. Wilkins felt the change order required L-C to have surveyors on the site throughout the muck and fill operation to measure the depth of the cut required over the entire area involved. In fact, L-C sent the surveyors after-the-fact to drill test holes at random sites to calculate the volume removed and replaced. Wilkins testified that the depth to reach good soil varied greatly over the entire site, and that JW had removed and replaced more material than the surveyors calculated.

Wilkins claimed he removed over 27,000 cubic yards of material, of which 15,000 cubic yards was attributed to the extra work. L-C's surveyor "shot" additional holes as directed by Wilkins, and ultimately arrived at a figure of 6,966 cubic yards after making allowance for a benchmark error.

Wilkins, unhappy with the great discrepancy between the physical volume he had moved according to the "truck counts" and the survey calculations, hired his own surveyor, Robert Sample, to verify the amount of material replaced. Sample testified the industry standard for calculating muck and fill would require a soil representative and surveyor on site at sufficient times during operations to take cross-sectional measurements (linear measurements of the depth of soil removed).[4] Sample testified that his calculations were close to L-C's engineer's calculations because in doing the test borings both surveyors were provided with the same data from which mathematical calculations would not differ. Sample stated that a "truck count," although subject to ranges of volume content, would be more accurate than the random test borings that had been done. Sample testified that a true cross-section would have been the most accurate.

Wilkins then tried to document the amount of material that had been moved by physically counting the piles of dumped material. Wilkins testified that because the distance between the project and the dumping property was less than two miles,

[4] The issue of what industry standards required was first raised by L-C in its cross-examination of Wilkins.

the trucks had been overfilled. Thus, he felt his estimate would be very conservative. Wilkins estimated the amount of material replaced to be 8,120 cubic yards and added a 20% shrinkage factor, for a total of 9,744 cubic yards.[5] Heyward, on behalf of Citadel Management, steadfastly refused to use "truck counts" to determine the amount of muck and fill work.

Wilkins' request for payment for the muck and fill work (and other work that was not covered by the original contract or change order but that had been requested by L-C) was rejected.[6] Wilkins had requested an additional payment of $104,635 above the $110,000 agreed upon in the original contract. L-C's change order, however, provided for additional payment of only $72,087. Wilkins, under extreme pressure to pay subcontractors and material providers, signed L-C's version of the change order. Heyward and Phillips were aware of the pressure on Wilkins, and of his vigorous protests. Wilkins contemporaneously executed a release and waiver of lien for $47,383.12, and L-C caused that amount to be disbursed in the form of joint checks to JW and its subcontractors and suppliers.

In November 1988, Heyward called JW to return and complete its portion of the project. Wilkins returned and found much of the grading had been ruined by other contractors and had to be redone. L-C allowed JW an additional $1,000 for regrading, and, with Wilkins' approval, deleted $5,000 of the asphalt work required by the original contract. Throughout this time Wilkins complained over the inadequacy of payment for the muck and fill work. Jody Miot, Laurel Storage's principal, assured Wilkins that the payment amount would reflect the volume of work done.

The weather hampered JW's efforts to commence the regrading. On December 16, 1988, L-C wrote to JW, notifying JW to complete work by January 1, 1989. JW received the letter on December 19, and Wilkins testified JW could have completed the work by January 1. However, On December 21, 1988, JW received a letter from Heyward dated December

---

[5] The referee held that Wilkins was trained as an engineer and capable of making these calculations. L-C did not challenge this finding.

[6] The additional work was: equipment rental for attempted de-watering prior to the muck and fill operation, equipment for soil testing, and other extras due to engineering miscalculations provided by L-C.

20th terminating JW's contract. L-C hired Fleming construction Company, a substitute contractor, to finish JW's portion of the project. Fleming finished the work in three days. JW subsequently brought this action.

Surveyor Kenneth Sigler testified for L-C, and stated that cross-sectioning was the most accurate method of surveying to determine the amount of muck and fill.

After reciting the facts, the special referee outlined three issues: (1) whether L-C properly paid JW for the muck and fill work; (2) whether the August 23 change order and release was effective against JW; and (3) whether L-C wrongfully terminated JW's contract.

The special referee found implicit in the change order the requirement that the on-site surveyors would be hired by L-C, because the agreement allowed JW the right to hire its own surveyor to recheck the findings. The special referee stated that "[s]ince the document was drafted by Citadel on behalf of L-C, any ambiguity must be construed against L-C."[7] The special referee noted cross-sections were never done even though the industry standard method of making the calculations called for by the change order required cross-sections. The special referee found that "L-C chose not to incur the expense of an on-site engineer and as such, the best method of determining the volume of muck and backfill was not employed." The special referee also found that because surveyors and soil representatives were not present except for three "sporadic" visits, cross-sectioning was impossible. The special referee found this situation was caused by L-C, not by JW, and resulted in a breach by L-C of the terms of the June 2nd change order. Accordingly, the special referee found that the amount due JW under the change order as determined by truck count was reasonable.

Having determined that L-C breached the change order, the special referee next addressed the effect of the August 23, 1988 change order Wilkins signed. Wilkins testified without objection that he signed under protest and only because he was being pressured by subcontractors and suppliers for payment. Mechanic's liens had been filed and lawsuits threatened. Wilkins continued to object to the amount even after he signed

---

[7] On appeal L-C does not argue against this ruling.

the change order. Miot testified that had Wilkins not signed the change order and lien waiver, L-C would not have paid JW. The special referee held this placed JW in a "very tenuous position."[8] The special referee found that L-C placed JW in a position of not being able to pay its own suppliers and materialmen, then proposed a change order based upon engineering calculations not in compliance with the June 2, 1988, document. The special referee held that because of the exigency of the situation, JW was forced to accede to secure the joint checks and satisfy the demands of its subcontractors and suppliers.

Finally, the special referee noted that section 14.2.2 of the original contract authorized L-C to terminate JW for cause on seven days written notice, but only after certification by an architect. The special referee rejected L-C's claim that JW did not return to the site in November 1988. The special referee found JW was making progress towards completion when L-C terminated the contract. The special referee held that L-C's failure to give seven days notice as required by the contract was a material breach of the agreement. The special referee accordingly awarded JW judgment for $32,110.48. L-C appeals.

L-C first argues the court erred in basing damages on truck counts, because: (1) the parties did not agree to use truck counts, and in fact specifically rejected the method when negotiating the change order; (2) the method used, while not ideal, was within proper surveying practice, and was the method the parties agreed upon; and (3) the August 23, 1988, written change order settled the issue of the quantity of muck and fill. L-C argues the contract required any changes to be made in writing,[9] and the writings the parties executed constituted the parties' entire agreement. L-C

---

[8] The referee noted that the lien waiver originally reflected payment of $47,383.12, the exact amount of the second disbursement. However, the amount was later altered to reflect payments of $147,383.12, apparently to satisfy a bank requirement that it reflect all amounts paid as of that date. The true amounts paid were $99,000 under the original contract, and $47,383.12 under the change order, for a total of $146,383.12. The referee noted that the original dollar sign on the waiver was replaced with a "1" to alter the figure and make the discrepancy only $1,000 instead of $99,000. The implication is that L-C altered the document after Wilkins signed it.

[9] In fact, the law provides that a contract may be modified orally, even if the contract says it may only be modified in writing. *South Carolina Nat'l Bank v. Silks*, 295 S.C. 107, 367 S.E. (2d) 421 (Ct. App. 1988); *Sanchez v. Tilley*, 285 S.C. 449, 330 S.E. (2d) 319 (Ct. Ap. 1985).

argues the parol evidence rule therefore barred introduction of oral testimony to vary the terms of the contract. These arguments ignore the fact that the special referee found any ambiguity in the agreement must be construed against L-C, that the contract required L-C to provide an engineer on-site throughout the muck and fill operation, and that L-C's failure to do so amounted to a breach of the agreement in such a way so as to prevent the survey method required by the agreement from being accurate. *See Morgan v. Crowley*, 91 Ga. App. 58, 85 S.E. (2d) 40 (1954) (a party cannot take advantage of his own default in the performance of a contract); 17A Am. Jur. (2d) *Contracts* § 621 (1991) (where a contract is not performed, the party who is guilty of the first breach is generally the one upon whom all liability for the nonperformance rests). *Cf. Champion v. Whaley*, 280 S.C. 116, 311 S.E. (2d) 404 (Ct. App. 1984) (party to a contract cannot take advantage of the uncertainty created by his own wrongdoing).

L-C argues the special referee erred in finding Wilkins executed the August 23, 1988, waiver and release under duress. L-C claims JW did not plead duress, nor did it ask the special referee to reform the contract in equity. The special referee held that the allegations in the complaint sufficiently generally alleged duress. L-C alleges the special referee "erred in holding that duress was a general allegation which could be proved without special pleading."

Duress is a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or form a contract not of his own volition. *Cherry v. Shelby Mut. Plate Glass & Casualty Co.*, 191 S.C. 177, 4 S.E. (2d) 123 (1939) (quoting *In re Nightingale's Estate*, 182 S.C. 527, 189 S.E. 890 (1937)). Rule 9(b), SCRCP, provides in part "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally" (emphasis ours). We find no error in the special referee's ruling.

L-C further argues the evidence does not meet the legal standard for voiding a written agreement because of duress. Duress has been defined as coercion that puts a person in such fear that he is "bereft" of the quality of mind essential to the making of a contract; moreover, the contract must be obtained as a result of this state of mind. *In re*

*Nightingale's Estate,* 182 S.C. 527, 189 S.E. 890 (1937). Whether or not duress exists in a particular case is a question of fact to be determined according to the circumstances of each case, such as the age, sex, and capacity of the party influence. *Id.* In *Nightingale's Estate,* the court stated:

> The fear which makes it impossible for a person to exercise his own free will is not so much to be tested by the means employed to accomplish the act, as by the state of mind produced by the means invoked. If one of the parties to an agreement is in a position to dictate its terms to such an extent as to substitute his will for the will of the other party thereto, it is not a mutual, voluntary agreement, but becomes an agreement emanating entirely from his own mind.

*Id.* at 547, 189 S.E. at 898. *See also* Restatement (Second) of Contracts § 175(1) (1981) (if a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim to reasonable alternative, the contract is voidable by the victim). The record contains evidence from which the special referee, as fact finder, could determine that L-C left JW with no reasonable alternative but to sign the August 23, 1988 release and waiver of lien.

L-C next argues the special referee erred in failing to find L-C properly terminated the contract for JW's failure to perform its contract, for abandoning the site, and for allowing the property to be made subject to liens. L-C argues JW made clear its intention not to return to the site, and when an abandoning party shows its intent not to return, the law permits termination before the end of a contract term. This position was not argued to the special referee, and he did not rule on it. In any event, whether JW had abandoned the contract was a question for the special referee as fact finder. The special referee undoubtedly resolved this point against L-C.

We do not address the remaining arguments raised by L-C. We find they are manifestly without merit. S.C. Code Ann. § 14-8-250 (Supp. 1993); Rule 220(b)(2), SCACR. Accordingly, the judgment is

Affirmed.

SHAW and BELL, JJ., concur.