612 S.E.2d 469

**Nataliya HOLLER, Respondent,**

v.

**William HOLLER, Appellant.**

**No. 3979.**

Court of Appeals of South Carolina.

Heard April 4, 2005.
Decided April 18, 2005.
Rehearing Denied June 22, 2005.

258

William Holler, of Rock Hill, Pro Se, for Appellant.

David Bradley Jordan, of Rock Hill and Harold A. Oberman, of Charleston, for Respondent.

ANDERSON, J.

William Holler (Husband) appeals from the family court's determination that a premarital agreement signed by Nataliya[1] Holler (Wife) is not enforceable. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

Wife is originally from Ukraine. She was educated in Ukraine and taught college students in that country. English is not Wife's first language. After seeing Husband's picture in "a feminine magazine," Wife wrote a letter to him in English and included her phone number. Thereafter, Husband and Wife talked on the phone for "[a]bout a year." Their conversations were in English. During this time, Husband visited Wife in Ukraine.

On September 5, 1997, Wife traveled to the United States to marry Husband. At the time of her arrival, Wife's English was "really poor." Husband disputed Wife's inability to speak

---

1. Wife is referred to in the record as both Nataliya and Natasha.

English, claiming she spoke "[v]ery well." Upon completing an English course, Wife received a certificate from Central Piedmont College in May of 1998.

In October or early November 1997, Wife became pregnant with Husband's child. Wife's visa was scheduled to expire on December 4, 1997, and she would have to return to Ukraine unless she married Husband. Wife came to the United States without money and relied upon Husband to provide support.

Wife admitted that, while she was still in Ukraine, Husband told her about the premarital agreement. However, Wife believed she "needed to sign some papers under the law of South Carolina before we g[o]t married." Wife claimed: "[Husband] faxed me some documents for American Embassy, and one page was he told me that we need—when you get to United States we have to sign that agreement before we get married because this is under [the] law of South Carolina." Husband delivered the premarital agreement to Wife sometime before the marriage. Husband first stated he faxed it to her five or six months before she arrived in the United States. Husband maintained he handed her a copy to sign within a week after she arrived. Yet, Wife declared Husband gave her a copy of the premarital agreement only two weeks before she signed it.

Prior to signing the premarital agreement, Wife attempted to translate a portion of the agreement from English into Russian, but was unable to complete the translation. "Because it was too hard," Wife became frustrated with the translation and quit. Wife had eleven pages of translation before she determined the effort was futile. Wife professed the agreement "had specific language which [she did not] understand even in Russian." Wife never retained counsel because she had no money to pay someone to review the agreement.

Wife signed the agreement on November 25, 1997. The parties were married on December 1, 1997, merely three days before Wife's visa was set to expire.

Husband and Wife separated on February 13, 2000. Wife brought this action seeking a divorce, custody of the parties' child, child support, equitable distribution of marital property, and alimony. Husband answered and counterclaimed. Subse-

quently, he filed a motion to dismiss the claims for alimony and equitable distribution asserting the premarital agreement controlled. After a hearing, the family court denied the motion to dismiss. The court ruled the premarital agreement was invalid and unenforceable because it was signed under duress and was unconscionable.

## STANDARD OF REVIEW

In appeals from the family court, this court may find facts in accordance with its own view of the preponderance of the evidence. *Dearybury v. Dearybury*, 351 S.C. 278, 569 S.E.2d 367 (2002); *Lanier v. Lanier*, 364 S.C.App. 211, 612 S.E.2d 456, 2005 WL 645880 (2005); *Moghaddassi v. Moghaddassi*, 364 S.C.App. 182, 612 S.E.2d 707, 2005 WL 196558 (2005). However, this broad scope of review does not require us to disregard the family court's findings. *Bowers v. Bowers*, 349 S.C. 85, 561 S.E.2d 610 (Ct.App.2002); *Badeaux v. Davis*, 337 S.C. 195, 522 S.E.2d 835 (Ct.App.1999). Nor must we ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lacke v. Lacke*, 362 S.C. 302, 608 S.E.2d 147 (Ct.App.2005); *Murdock v. Murdock*, 338 S.C. 322, 526 S.E.2d 241 (Ct.App.1999); *see also Dorchester County Dep't of Soc. Servs. v. Miller*, 324 S.C. 445, 477 S.E.2d 476 (Ct.App.1996) (noting that because the appellate court lacks the opportunity for direct observation of witnesses, it should accord great deference to the family court's findings where matters of credibility are involved).

## LAW/ANALYSIS

Husband raises numerous issues regarding the findings of fact made by the family court. In essence, the attack by Husband on the order of the family court involves two issues: (1) whether the court erred in finding the premarital agreement invalid and unenforceable; and (2) whether the family court had jurisdiction to determine the validity of the premarital agreement.

### I. JURISDICTION OF FAMILY COURT

Husband argues the family court was without jurisdiction to determine the validity of the premarital agreement.

He maintains Wife should have brought her action in the circuit court because the premarital agreement barred Wife from receiving alimony and designated the parties' respective property as nonmarital. We disagree.

The jurisdiction of the family court is determined by section 20–7–420 of the South Carolina Code (Supp.2004). Section 20–7–420(2) provides:

The family court shall have exclusive jurisdiction:

. . . .

(2) To hear and determine actions:

For divorce a vinculo matrimonii, separate support and maintenance, legal separation, *and in other marital litigation between the parties,* and for settlement of all legal and equitable rights of the parties in the actions in and to the real and personal property of the marriage and attorney's fees, if requested by either party in the pleadings.

S.C.Code Ann. § 20–7–420(2) (Supp.2004) (emphasis added). South Carolina Code section 20–3–130(G) states:

(G) The Family Court may review and approve all agreements which bear on the issue of alimony or separate maintenance and support, whether brought before the court in actions for divorce from the bonds of matrimony, separate maintenance and support actions, or in actions to approve agreement where the parties are living separate and apart. The failure to seek a divorce, separate maintenance, or a legal separation does not deprive the court of its authority and jurisdiction to approve and enforce the agreements.

S.C.Code Ann. § 20–3–130(G) (Supp.2004).

This court and the South Carolina Supreme Court have allowed appeals from the family court involving a premarital agreement without raising an issue of jurisdiction. *See, e.g., Hardee v. Hardee,* 355 S.C. 382, 585 S.E.2d 501 (2003); *Bowen v. Bowen,* 352 S.C. 494, 575 S.E.2d 553 (2003); *Heins v. Heins,* 344 S.C. 146, 543 S.E.2d 224 (Ct.App.2001). In *Gilley v. Gilley,* 327 S.C. 8, 488 S.E.2d 310 (1997), the validity of the prenuptial agreement of the parties was not challenged. The *Gilley* court analyzed the status of the property, i.e., marital

or nonmarital in the context of the prenuptial agreement. The court expounded:

[H]usband asked the family court for an order of separate maintenance requiring the parties to live separate and apart, equitable distribution of the marital home and other personal property, and attorney's fees. The family court dismissed husband's action finding it did not belong in family court since the prenuptial agreement provides that neither party can claim alimony or separate maintenance. Further, the family court dismissed the action because the prenuptial agreement provided that property acquired by the parties during the marriage or owned at the time of the marriage would not be the subject of any claims for equitable apportionment. The family court ruled that any claims arising from property or investments must be asserted in circuit court. We agree.

The family court has exclusive jurisdiction to hear and determine actions for separate support and maintenance, legal separation, other marital litigation between the parties, and for settlement of all legal and equitable rights of the parties in the actions related to the real and personal property of the marriage. S.C.Code Ann. § 20–7–420(2) (Supp.1995). Property excluded by written contract or antenuptial agreement of the parties is excluded from marital property and is considered nonmarital property. S.C.Code Ann. § 20–7–473 (Supp.1995). The family court does not have authority to apportion nonmarital property. *Id.*

*Gilley*, 327 S.C. at 11, 488 S.E.2d at 312. Property excluded from the marital estate by written contract or premarital agreement of the parties is considered nonmarital property over which the family court has no jurisdiction. *See* S.C.Code Ann. § 20–7–473 (Supp.2004) (noting that family court "does not have jurisdiction or authority to apportion nonmarital property"); S.C.Code Ann. § 20–7–473(4) (Supp.2004) (stating that property excluded from the marital estate by written contract of the parties is considered nonmarital property).

In the instant case, the litigation between the parties was clearly marital in nature as the Wife sought a divorce, custody of the child, child support, alimony, and equitable distribution of the marital property. Husband asserted the premarital

agreement as a defense to the causes of action for alimony and equitable distribution. The family court was then required to determine, pursuant to *Hardee v. Hardee*, 355 S.C. 382, 585 S.E.2d 501 (2003), whether the premarital agreement was valid and enforceable.

The family court, in the case *sub judice*, did not attempt to distribute nonmarital property or provide support in contravention of the agreement, as was sought by the husband in *Gilley*. The determination of the enforceability of the agreement arose in the course of marital litigation and was within the family court's jurisdiction under section 20–7–420(2). Concomitantly, the family court was correct in applying the jurisdiction of the court.

## II. PREMARITAL AGREEMENT

Husband contends the trial court erred in finding the premarital agreement was invalid and unenforceable as a result of being unconscionable and signed under duress.

Premarital agreements, also called antenuptial or prenuptial agreements, are agreements between prospective spouses made in contemplation of marriage. *Black's Law Dictionary* defines a prenuptial agreement as "[a]n agreement made before marriage usu[ally] to resolve issues of support and property division if the marriage ends in divorce or by the death of a spouse." *Black's Law Dictionary* 1220 (8th ed.2004). Antenuptial settlements are contracts or agreements entered into between a man and woman before marriage, but in contemplation and generally in consideration of marriage, whereby the property rights and interests of either the prospective husband or wife, or of both of them, are determined, or where property is secured to either or to both of them, or to their children. 41 C.J.S. *Husband and Wife* § 61 (1991).

The consideration for a premarital agreement is the marriage itself. Because such agreements are executory, they become effective only upon marriage. *See South Carolina Loan & Trust Co. v. Lawton*, 69 S.C. 345, 48 S.E. 282 (1904). In *South Carolina Loan & Trust Co. v. Lawton*, the Supreme Court explained:

There is not complete execution of such instruments until actual marriage, and it does not matter how many changes may be made, and how many different instruments may be signed, the settlement, in the last form it assumes before marriage, is the real contract supported by the consideration of marriage.

*Id.* at 349, 48 S.E. at 283.

In *Stork v. First National Bank,* 281 S.C. 515, 316 S.E.2d 400 (1984), the Supreme Court inculcated:

Antenuptial agreements, which usually involve the wife-to-be giving up her right to dower in consideration of marriage, will be enforced if made voluntarily and in good faith and if fair and equitable. *Rieger v. Schaible,* 81 Neb. 33, 115 N.W. 560 (1908) (citing *Pierce v. Pierce,* 71 N.Y. 154, 27 Am.[St.]Rep. 22). Such contracts are not opposed to public policy but are highly beneficial to serving the best interest of the marriage relationship.

*Id.* at 516, 316 S.E.2d at 401. An antenuptial contract is valid and will be upheld when, and only when, it is entered into freely, fairly, and in good faith by parties legally competent to contract. 41 C.J.S. *Husband and Wife* § 62 (1991). An antenuptial agreement must be free from duress, fraud, deceit, misrepresentation, or overreaching. *Id.* Further, the agreement must not be unconscionable. *Id.*

The South Carolina Supreme Court, in *Hardee v. Hardee,* 355 S.C. 382, 585 S.E.2d 501 (2003), explicated:

Recent case law of this Court supports Husband's contention that parties are free to contractually alter the obligations which would otherwise attach to marriage. In *Stork v. First Nat'l Bank of South Carolina,* 281 S.C. 515, 516, 316 S.E.2d 400, 401 (1984), this Court held that antenuptial agreements "will be enforced if made voluntarily and in good faith and if fair and equitable.... Such contracts are not opposed to public policy but are highly beneficial to serving the best interest of the marriage relationship."

*Id.* at 387, 585 S.E.2d at 503. In determining whether a premarital agreement should be enforced, our supreme court professed:

(1) Was the agreement obtained through fraud, duress, or mistake, or through misrepresentation or nondisclosure of

material facts? (2) Is the agreement unconscionable? (3) Have the facts and circumstances changed since the agreement was executed, so as to make its enforcement unfair and unreasonable?

*Id.* at 389, 585 S.E.2d at 504 (internal quotations omitted).

## A. Duress

■ Husband avers the family court improperly concluded Wife signed the premarital agreement while under duress. We disagree.

■ Duress is a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or form a contract not of his own volition. *Cherry v. Shelby Mut. Plate Glass & Cas. Co.*, 191 S.C. 177, 4 S.E.2d 123 (1939); *Cox & Floyd Grading, Inc. v. Kajima Constr. Servs., Inc.*, 356 S.C. 512, 589 S.E.2d 789 (Ct.App.2003); *Willms Trucking Co. v. JW Constr. Co.*, 314 S.C. 170, 442 S.E.2d 197 (Ct.App.1994).

*Corpus Juris Secundum* defines duress:

"Duress" may be defined as subjecting a person to a pressure which overcomes his or her will and coerces him or her to comply with demands to which he or she would not yield if acting as a free agent. Some definitions of "duress" contain not only the element of pressure overcoming the victim's will but also the element that the pressure or compulsion consists of improper, wrongful, or unlawful conduct, acts, or threats.

Further, "duress" has been defined as the condition of mind produced by the wrongful conduct of another rendering a person incompetent to contract with the exercise of his or her free will power, or as the condition of mind produced by an improper external pressure destroying free agency so as to cause the victim to act or contract without use of his or her own volition, or as unlawful constraint whereby a person is forced to do some act against his or her will.

17A C.J.S. *Contracts* § 175 (1999) (footnotes omitted).

The central question with respect to whether a contract was executed under duress is whether, considering all the surrounding circumstances, one party to the transaction was

prevented from exercising his free will by threats or the wrongful conduct of another. 17A Am.Jur.2d *Contracts* § 218 (2004). Freedom of will is essential to the validity of an agreement. *Id.* A party claiming "duress" can prevail if he shows that he has been the victim of a wrongful or unlawful act or threat of a kind that deprives the victim of unfettered will, with the result that he was compelled to make a disproportionate exchange of values. *Id.*

In order to establish that a contract was procured through duress, three things must be proved: (1) coercion; (2) putting a person in such fear that he is bereft of the quality of mind essential to the making of a contract; and (3) that the contract was thereby obtained as a result of this state of mind. *In re Nightingale's Estate,* 182 S.C. 527, 189 S.E. 890 (1937). The fear which makes it impossible for a person to exercise his own free will is not so much to be tested by the means employed to accomplish the act, as by the state of mind produced by the means invoked. *Id.; Willms Trucking Co.,* 314 S.C. at 179, 442 S.E.2d at 202. If one of the parties to an agreement is in a position to dictate its terms to such an extent as to substitute his will for the will of the other party thereto, it is not a mutual, voluntary agreement, but becomes an agreement emanating entirely from his own mind. *In re Nightingale's Estate,* 182 S.C. at 547, 189 S.E. at 898; *Willms Trucking Co.,* 314 S.C. at 179, 442 S.E.2d at 202. If a partys manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim. *Willms Trucking Co.,* 314 S.C. at 179, 442 S.E.2d at 202. Whether or not duress exists in a particular case is a question of fact to be determined according to the circumstances of each case, such as the age, sex, and capacity of the party influenced. *Id.; see also Santee Portland Cement Corp. v. Mid–State Redi–Mix Concrete Co.,* 273 S.C. 784, 260 S.E.2d 178 (1979) (stating whether or not duress was present is a question ordinarily determined on a case by case basis).

Duress is viewed with a subjective test which looks at the individual characteristics of the person allegedly influenced, and duress does not occur if the victim has a reasonable alternative to succumbing and fails to take advantage of it.

*Blejski v. Blejski,* 325 S.C. 491, 480 S.E.2d 462 (Ct.App.1997) (citing Restatement (Second) of Contracts § 175 cmt. b & c (1981)). Duress is a defense to an otherwise valid contract. 17A Am.Jur.2d *Contracts* § 218. Duress renders a contract voidable at the option of the oppressed party. *Santee Portland Cement Corp.,* 273 S.C. at 784, 260 S.E.2d at 178.

Assumptively concluding Wife was allowed the opportunity to view the premarital agreement three months in advance, the evidence in the record indicates: (1) Wife did not understand the contents of the agreement; (2) she did not freely enter into the agreement; (3) she attempted to translate the agreement into Russian in order to better comprehend the document; (4) she became frustrated as she was unable to complete a satisfactory translation; and (5) her notes indicate there are several words for which she could not find a translation, including "undivided," "equitable," and "pro rata." Consequently, Wife could not understand the agreement.

Additionally, Husband was aware of the deadline with respect to Wife's visa. According to his own testimony, Husband made it perfectly clear to Wife that she must sign the agreement if she wanted to be married prior to the expiration of her visa. Wife was in the United States with no means to support herself. She relied solely and completely on Husband for support. Wife had no money of her own with which to retain and consult an attorney or a translator. Whether a party obtained independent legal advice is a significant consideration in evaluating whether an antenuptial agreement was voluntarily and understandingly made. *See* 41 C.J.S. *Husband and Wife* § 62 (1991). The family court found if Wife was not able to marry, then she would be forced to return to Ukraine. Because she was pregnant with Husband's child, she sought to insure his continued support and to remain in the United States.

Wife did not enter into the agreement freely and voluntarily. Ample evidence exists to support the family court's determination that Wife, given the circumstances she faced, signed the agreement under duress and without a clear understanding of what she was signing. The family court did not err in finding Wife signed the agreement under duress.

### B. Unconscionability

■ Husband asseverates the trial court erred in finding the agreement was unconscionable and, therefore, unenforceable. We disagree.

■ Unconscionability is the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms which are so oppressive that no reasonable person would make them and no fair and honest person would accept them. *Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 361 S.C. 544, 606 S.E.2d 752 (2004); *Hardee v. Hardee*, 355 S.C. 382, 585 S.E.2d 501 (2003); *Fanning v. Fritz's Pontiac–Cadillac–Buick, Inc.*, 322 S.C. 399, 472 S.E.2d 242 (1996); *see also* 17 C.J.S. *Contracts* § 4 (1999) (noting some courts state that a party seeking to show an agreement is unconscionable must show that, at the time the agreement was formed, there was an absence of meaningful choice and the contract terms unreasonably favor one party).

■ "In determining unconscionability, courts are limited to considering facts and circumstances existing when the contract was executed." *Hardee v. Hardee*, 348 S.C. 84, 95–96, 558 S.E.2d 264, 269–70 (Ct.App.2001) (citing Restatement (Second) of Contracts § 208 (1981)), *aff'd as modified*, 355 S.C. 382, 585 S.E.2d 501 (2003); *see also Lackey v. Green Tree Fin. Corp.*, 330 S.C. 388, 397, 498 S.E.2d 898, 903 (Ct.App.1998)("If the court finds that a contract clause was unconscionable at the time it was made, the court may refuse to enforce the contract clause or limit the application of the unconscionable clause to avoid any unconscionable result."). "A determination whether a contract is unconscionable depends upon all the facts and circumstances of a particular case." 17A Am.Jur.2d *Contracts* § 279 (2004); *see also* 17 C.J.S. *Contracts* § 4 (1999) ("The determination of unconscionability is fact specific, and the totality of the circumstances must be assessed.").

In order to determine whether the agreement was unconscionable, we examine its terms and their application to the parties. The agreement provided in part that both parties would be responsible for paying rent as well as real estate taxes and utilities on a property owned by Husband's mother and leased to Husband. The agreement required Husband "shall have a proportionate interest in the increase in value

during the marriage of the homestead real estate, proportionate to the percentage contribution of the household expenses, if any, and child care/household duties performed by William Holler during the course of the marriage." The agreement did *not* contain a similar provision regarding Wife's interest as a result of her contributions of childcare or household duties.

Profoundly, the agreement stated:

**10. Support.** Each of the parties has income from property interest sufficient to provide for his or her respective support. Each has been self-supporting for a period of time prior to the contemplated marriage. Both parties feel that they are capable of future self-support and of maintaining themselves on a self-supporting basis.

However, at the time the agreement was signed, Husband was providing all of Wife's support and knew Wife had to return to Ukraine unless she obtained independent subsidy.

Significantly, the exhibit listing the parties' respective financial information reveals Husband had a net worth over $150,000 with $30,000 in annual income, while Wife had $0.00 listed beside each category of assets as well as $0.00 for her net worth. The declaration indicated she earned $1,400.00 per year as a music teacher *in Ukraine.* Apodictically, we find ample evidence in the record demonstrating the premarital agreement was unconscionable and, therefore, unenforceable.

## CONCLUSION

The family court possessed jurisdiction to determine whether the premarital agreement was valid and enforceable. Further, the family court did not err in finding: (1) Wife signed the agreement under duress; and (2) the agreement was unconscionable and unenforceable. Accordingly, the decision of the family court is

**AFFIRMED.**

BEATTY and SHORT, JJ., concur.