757 S.E.2d 727

**H. Eugene HUDSON, Appellant,**

**v.**

**Mary Lee HUDSON, Respondent.**

**Appellate Case No. 2012–212690.**

**No. 5217.**

Court of Appeals of South Carolina.

Heard March 11, 2014.

Decided April 16, 2014.

Rehearing Denied May 22, 2014.

C. Dixon Lee, III, of McLaren & Lee, of Columbia, and E. Windell McCrackin, of McCrackin, Barnett & Richardson, LLP, of Myrtle Beach, for Appellant.

Carolyn R. Hills and James L. Hills, both of Hills & Hills, P.C., and Russell Warren Mace, III, and Nicole N. Mace, of The Mace Firm, all of Myrtle Beach, for Respondent.

SHORT, J.

In this divorce action, H. Eugene Hudson (Husband) appeals the family court's equitable distribution award to Mary Lee Hudson (Wife). Husband argues the family court erred in the following rulings: (1) finding a prenuptial agreement (the Agreement) was unconscionable; (2) awarding an equitable interest in the increase in value of allegedly nonmarital property; (3) exercising jurisdiction over allegedly nonmarital property; (4) failing to make specific findings of fact; and (5) requiring Husband to pay a portion of Wife's attorney's fees. We reverse.

**FACTS**

The parties began dating in 1995 or 1996 and became engaged in November 1999. Husband was a licensed attorney, but he was no longer practicing. Husband owns his own business, Myrtle Beach Lifeguards, Inc. (Lifeguards), and he has numerous profitable investments. Wife has an Associate's degree in fashion merchandising, and she has spent most of her career in networking and marketing. The marriage was Husband's second and Wife's first. No children were born of the marriage. At the time of the marriage, Husband was sixty-three years old and Wife was forty-one years old. The parties separated on October 19, 2008.

The parties entered into the Agreement on February 4, 2000, and were married on February 19, 2000. The Agreement provides in relevant part:

7. The Husband hereby waives, discharges, releases, and quit-claims any and all right, title or interest whatsoever which he may claim in the property now owned, or hereafter acquired, of Wife by reason of this marriage.

8. The Wife hereby waives, discharges, releases, and quit-claims any and all right, title or interest whatsoever which she may claim in the property now owned, or hereafter acquired, of Husband by reason of this marriage.

9. Each party waives, discharges, and releases any and all claims and rights that he or she may acquire by reason of the marriage, including, but not limited to, the following:

. . . .

d. any claim for alimony, support, any interest in any asset in the name of the other party, or any other name arising from the marriage. . . .

Husband filed this divorce action. The family court bifur-cated the final hearing to first determine the validity of the Agreement and to then take testimony on the remaining issues.

Husband testified he believed the Agreement would protect Lifeguards and all income derived therefrom. He understood "if the marriage didn't work out that it would place the parties back where they were." Wife testified she believed the Agreement's purpose was to protect Husband's family property, including a flea market. The family court found the parties intended to protect the "lifeguard service."

Husband's attorney drafted the Agreement. Husband testified he recommended Wife take the Agreement to an attorney, Steven Solomon, with whom he had once shared an office building. Solomon and Husband were allegedly close friends and colleagues. Wife testified Husband called her on February 4 to sign the Agreement. He allegedly told her she could not use her attorney of choice, Alan Clemmons, but she had to use Solomon. Wife did not understand she could not use Clemmons because he was employed with Husband's lawyer's firm at the time.

Wife testified she never saw the Agreement prior to arriving at Solomon's office, and she never read it. She and Solomon talked for about an hour while Solomon flipped through the Agreement. Wife testified she expressed concern to Solomon about the Agreement and told him she had not read it. She also expressed her belief the Agreement's purpose was to protect Husband's family's flea market property because Husband was concerned about it. Solomon allegedly discussed the family property with her, and told her she was protected and the Agreement was fair. According to Wife, Solomon discussed portions of the Agreement, but he never explained she was waiving alimony, inheritance rights, or marital earnings. Rather, Solomon told Wife that Husband was a "fine individual, he'd known him for a very long time." Wife went from Solomon's office to Husband's attorney's office and signed the Agreement with Husband present on February 4, 2000.[1] Neither Husband nor Wife paid Solomon a fee.

Wife testified the wedding plans were in full force, the wedding was in two weeks, she had sold her vehicle, and she had quit her job at the time she signed the Agreement. She explained that under the circumstances, she would have signed the Agreement regardless of whether it was fair, unless she knew it was fraudulent.

Dr. Douglas Ritz, a clinical psychologist, testified he evaluated Wife. Ritz noted the two-week time frame between Wife signing the Agreement and the date of the wedding added a heightened sense of urgency to Wife. He further agreed Wife had so much confidence and trust in Husband that "she would do most anything he requested." Dr. Ritz concluded Wife was not under the legal definition of duress when she signed the Agreement. However, he believed she would have been devastated to walk away from the relationship and the impending wedding at the time. Dr. Ritz opined Wife was capable at the time the Agreement was signed, but she was emotional and trusted Husband. He concluded Wife would not have been able to understand the Agreement in the short period of time she was with Solomon.

---

1. Husband testified he was not present when Wife signed the Agreement. Wife testified they signed the Agreement together.

Husband admitted Wife was a good wife; shopped for groceries and cooked; and paid for renovations to the home. Wife testified she also helped Husband at Lifeguards, including computerizing the business, entertaining the lifeguards, and setting up and taking down umbrellas and chairs.

Husband omitted the flea market property and a franchise fee agreement from his financial declaration attached to the Agreement. Husband claimed he omitted the flea market property because at the time the Agreement was signed, his mother had a life estate in the property, and he had a remainder interest. He claimed he omitted the franchise fee agreement because although the franchise agreement was in his name, he leased it to Lifeguards for $50,000 per year and considered it Lifeguards' asset.

Wife's financial expert, Jeffrey E. Kinard, concluded the marital portion of Husband's earnings during the marriage was $551,878. Kinard also conservatively estimated the value of Lifeguards at $1.1 million and attributed $500,437 to a "marital allocation."

The family court issued an order filed January 12, 2012, and it held a hearing on both parties' motions to reconsider. In its amended final order, filed June 21, 2012, the family court found Wife was not under duress at the time she signed the Agreement. As to unconscionability, the family court made the following findings:

This Court does not find that the [A]greement is unconscionable as far as it deals with alimony and support. However, as it deals with equitable division of marital property-in other words, the earnings, marital earnings or increase in value of non-marital property, I do find that to be unconscionable in this action.

Thereafter, the court found Kinard was the only expert witness who testified as to the valuation of Husband's business holdings, and it found his work and conclusions "to be entirely credible and believable." The court equitably divided the "marital estate" by finding net marital earnings of $552,378. After considering the contributions of the parties to the marriage, the court awarded Wife a 45% share and Husband a 55% share. The court found Wife responsible for her own business-related debt of $16,783 and awarded her $248,070 as

marital property division and $52,000 in attorney's fees and costs. Husband's appeal follows.

## STANDARD OF REVIEW

On appeal from the family court, an appellate court reviews factual and legal issues *de novo*. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). *"De novo* review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the trial court's findings." *Lewis v. Lewis*, 392 S.C. 381, 390, 709 S.E.2d 650, 654–55 (2011).

## LAW/ANALYSIS

### 1. Enforceability of the Agreement

Husband argues the family court erred in finding the Agreement was unconscionable as to equitable distribution. We agree.

Our supreme court adopted the following test to determine whether a prenuptial agreement should be enforced: "(1) Was the agreement obtained through fraud, duress, or mistake, or through misrepresentation or nondisclosure of material facts? (2) Is the agreement unconscionable? (3) Have the facts and circumstances changed since the agreement was executed, so as to make its enforcement unfair and unreasonable?" *Hardee v. Hardee*, 355 S.C. 382, 389–90, 585 S.E.2d 501, 504 (2003) (internal quotation marks omitted).

Acknowledging this test, the family court found Wife was not under duress at the time she signed the Agreement, and the enforceability of the Agreement was met on all aspects of the first prong of the *Hardee* test. The family court further found the following:

As far as the third prong of the *Hardee* test, as to whether the facts and circumstances have changed since the [A]greement was executed, so as to make its enforcement unfair and unreasonable, I find that the provisions of the ... [A]greement that deal with alimony and support will be upheld.

As to unconscionability, which is the second prong of the test, the family court found the Agreement unconscionable as to equitable division. Thus, we review whether the Agree-

ment, regarding equitable division, was unconscionable and whether facts and circumstances have changed so as to make enforcement of the Agreement unfair or unreasonable.

■ Our supreme court in *Hardee* defined unconscionability as "the absence of meaningful choice on the part of one party due to one-sided contract provisions together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Hardee,* 355 S.C. at 390, 585 S.E.2d at 505. Courts are limited to considering the facts and circumstances that exist at the time of the execution of the contract when determining unconscionability. *Holler v. Holler,* 364 S.C. 256, 269, 612 S.E.2d 469, 476 (Ct.App.2005).

■ Under South Carolina's law governing unconscionability, we find the family court erred in finding the Agreement was unconscionable as to equitable distribution. Prenuptial agreements by their nature are agreements entered into prior to marriage to resolve support and property division if the marriage ends. *Id.* at 264, 612 S.E.2d at 473. Such agreements "are not opposed to public policy but are highly beneficial to serving the best interest of the marriage relationship." *Stork v. First Nat'l Bank of S. C.,* 281 S.C. 515, 516, 316 S.E.2d 400, 401 (1984).

Husband and Wife both cite *Hardee,* which we find distinguishable. The wife in *Hardee,* while precluded from alimony and attorney's fees, was not barred from receiving an equitable division of the property acquired during the parties' marriage. *See Hardee,* 355 S.C. at 386–87, 585 S.E.2d at 503. The agreement in *Hardee* provided that "all properties of any kind or nature ... which belong to each party, shall be and forever remain the personal estate of the said party...." *Id.* at 384, 585 S.E.2d at 502. However, the agreement in *Hardee* also provided: "The provisions contained herein shall in no way affect the property, whether real, personal or mixed which shall be acquired by the parties, whether titled separately or jointly, subsequent to the date of this Agreement." *Id.* at 385, 585 S.E.2d at 502 (emphasis removed). The supreme court found the "provision patently and unambiguously allow[ed] Wife equitable distribution of any and all

property acquired by the parties during the marriage. . . ." *Id.* at 387, 585 S.E.2d at 503.

In this case, the Agreement provided both Husband and Wife waived "any and all right, title or interest whatsoever which [he or] she may claim in the property now owned, or hereafter acquired, of [the other] by reason of this marriage." The Agreement also provided each party waived "any interest in any asset in the name of the other party." Thus, both Husband and Wife waived interest in the other's property. Unlike *Hardee*, there was no clause providing separate treatment for property acquired during the marriage. We find the Agreement's terms were not so one-sided or oppressive that no reasonable person would make them and no fair and honest person would accept them; therefore, the Agreement was not unconscionable as to equitable division.

■ Furthermore, we find the facts and circumstances in existence at the time the Agreement was signed did not make the otherwise valid agreement unconscionable. Wife argues the high pressure exerted on her due to the impending wedding and the parties' unequal bargaining power rendered the Agreement unconscionable. We disagree.

Wife testified she would have signed the Agreement regardless of its fairness, so long as it was not fraudulent. Although we have concern regarding Husband's referral of Wife to a friend for legal counsel, we find Wife willingly agreed to use Solomon as her counsel, and she knew of his failure to adequately advise her when she signed the Agreement. Wife admitted Solomon did not discuss the details of the Agreement and merely told her Husband was a good guy. Additionally, her psychologist testified Wife was capable at the time she signed the Agreement. We find the circumstances when the Agreement was signed did not render the Agreement unconscionable.

■ We likewise disagree with the family court's findings that the changes in circumstances since the Agreement was executed make enforcement fair only as to alimony and support. The court in *Hardee* looked at the changes in circumstances of the wife during the marriage, finding the wife was totally disabled and unable to support herself, but the facts and circumstances at the time of enforcement of the agree-

ment had not changed to such an extent that it was unfair or unreasonable to enforce the agreement. *Id.* at 390–91, 585 S.E.2d at 505. The court in *Hardee* found, "Wife here had a meaningful choice: she could have refused to sign the agreement and opted against marrying Husband if he insisted on a prenuptial agreement." *Id.* at 390, 585 S.E.2d at 505.

We conclude Wife's circumstances in this case have likewise not changed since the time the parties executed the Agreement so as to make the Agreement unfair or unreasonable. Thus, we also find no merit in Wife's reliance on *Holler.* In *Holler,* this court concluded the wife, who was from the Ukraine, did not enter into the premarital agreement freely and voluntarily, noting that not only was the wife pregnant when she executed the premarital agreement, but also her visa was about to expire (thus requiring her to leave the United States unless she married), she could not understand the agreement, and she had no money of her own to retain or consult with an attorney or a translator. *Holler,* 364 S.C. at 268, 612 S.E.2d at 475–76.

In this case, Wife entered the marriage with insignificant assets and was unemployed. At the time of the separation, Wife was employed and had substantially the same assets as when she entered the marriage, although she had a debt of $16,783 from a loss incurred due to the sale of her own business. We find *Holler* distinguishable and further find circumstances since the execution of the Agreement have not changed so as to make enforcement of the Agreement unfair or unreasonable.

■ Finally, Wife maintains Husband's failure to disclose the flea market and the franchise fee agreement from his financial declaration at the time of the execution of the Agreement rendered the Agreement unconscionable. The family court found Wife failed to meet the first prong of the test for unconscionability, and Wife did not appeal that finding. *See Hardee,* 355 S.C. at 389–90, 585 S.E.2d at 504 (explaining the first prong of the test is whether a prenuptial agreement was obtained through fraud, duress, mistake, or through misrepresentation or nondisclosure of material facts).

We find Husband's failure to disclose these assets was not substantially significant, and it did not affect the unconsciona-

bility of the Agreement. We find the Agreement itself is not unconscionable, and neither the attendant nor subsequent circumstances equated to unconscionability or rendered the Agreement unfair or unreasonable. Thus, we reverse the equitable distribution award to Wife. Furthermore, during oral argument, Wife acknowledged that if this court found the Agreement was valid, it would prevent the family court from awarding any equitable distribution.

## 2. Attorney's Fees

Husband argues the family court erred in awarding Wife $52,000 in attorney's fees and costs. In light of our finding that the Agreement was not unconscionable, we agree and reverse the award of attorney's fees and costs. *See Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991) (explaining beneficial results obtained are to be considered in determining whether an award of attorney's fees should be made); *Myers v. Myers,* 391 S.C. 308, 321, 705 S.E.2d 86, 93 (Ct.App.2011) (stating "it is not improper for this court to reverse an attorney's fees award when the substantive results achieved by trial counsel are reversed on appeal").

## 3. Remaining Issues

Husband also argues the family court erred in exercising jurisdiction over allegedly nonmarital property and in failing to make specific findings of fact. In light of our disposition on the equitable distribution issue, we decline to address Husband's remaining issues on appeal. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing an appellate court need not rule on remaining issues when the disposition of a prior issue is dispositive of the appeal).

## CONCLUSION

Based on the foregoing analysis, the family court's award of equitable distribution and attorney's fees is

**REVERSED.**

FEW, C.J., and GEATHERS, J., concur.