**RUDOLPH SLACK, Petitioner**
**v.**
**DONNA SLACK, Respondent**

Family No. ST-14-DI-3
Superior Court of the Virgin Islands
Division of St. Thomas and St. John
April 29, 2015

HINDS ROACH, *Judge*

## MEMORANDUM OPINION

(April 29, 2015)

THIS MATTER came before this Court for a hearing on September 17, 2014, October 6, 2014, and February 20, 2015 pursuant to Petitioner Rudolph Slack's Motion for Summary Judgment, as well as Respondent Donna Slack's Opposition thereto.[1]

---

[1] The hearing took place over a course of three (3) days. The September 17, 2014 hearing took place in person, while the October 6, 2014 and February 20, 2015 hearings occurred via video

Petitioner Rudolph Slack (Mr. Slack) appeared in person and through his counsel, Attorney Andrew L. Capdeville, Esq. Respondent Donna Slack (Mrs. Slack) appeared in person and through her counsel, Attorney Kevin F. D'Amour, Esq.

Mr. Slack's motion seeks summary judgment on two issues: 1) The dissolution of the marriage; and, 2) The validity and enforceability of an Antenuptial Agreement[2] executed by the parties prior to their marriage.

For the reasons that follow, Mr. Slack's motion for summary judgment is **GRANTED** as to the issue of the divorce absolute; and, **DENIED** as to the validity and enforceability of the Antenuptial Agreement.

## LAW AS TO SUMMARY JUDGMENT

Rule 56 of the Federal Rule of Civil Procedure — applicable to this Court through Rule 7 of the Rules of Superior Court — provides that judgment shall be rendered in favor of the moving party where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c)

A dispute over a material fact is "genuine" if the evidence is such that a reasonable fact-finder "could return a verdict for the non-moving party." *Ferris v. V.I Industrial Gases, Inc.*, 23 V.I. 183, 188 (D.V.I. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)). A fact is "material" when it has the ability to "affect the outcome of the suit under the governing law". *Id.*

While deciding whether there is a dispute of material fact, the court must grant all reasonable inferences from the evidence in favor of the non-moving part. *See In re Tutu Water Wells Contamination Litig.*, 78 F. Supp. 2d 456, 460, 42 V.I. 278 (D.V.I. 1999).

---

conference, where the Court sat in the Division of St. Croix, and the parties with their respective counsel, appeared in the Division of St. Thomas.

[2] Antenuptial Agreements are also commonly known as prenuptial agreements, or premarital agreements.

## FACTS AND DISCUSSION

### 1. Dissolution of the Marriage

*Facts*: The parties were married on July 17, 2004 on St. Thomas. After the marriage, the evidence suggests that the parties generally lived separately with Mr. Slack in St. Thomas, and Mrs. Slack in Florida with her children who, according to Mrs. Slack, were prohibited from relocating under the terms of a divorce from the father.[3] During most of the marriage, the couple traveled back and forth between Florida and St. Thomas, and cruised together extensively. Mrs. Slack also started and operated a St. Thomas based travel agency during a portion of the marriage.

The testimony revealed that during the course of the marriage, stressors — to include, Mr. Slack's family's disapproval of his marriage to Mrs. Slack, and Mrs. Slack's spending — put a strain on the marriage.

In or around 2013, the couple had an altercation which, according to witnesses resulted in the parties being in each "other's faces" and ended with Mrs. Slack returning her wedding ring to Mr. Slack.

According to Mr. Slack, since that time, he has lived in fear for his life because, he claims that Mrs. Slack has threatened him. Furthermore, per Mr. Slack, since the incident, Mrs. Slack has incurred substantial credit card debt without his knowledge or authorization.

For Mrs. Slack's part, she claims that Mr. Slack has been harassing her by, among other things, changing the locks on their home, locking the hurricane shutters to her bedroom window making the room unbearably hot, disconnecting the hot water heater to her shower, and disconnecting the phone, internet, and cable service to her room. Furthermore, according to Mrs. Slack, Mr. Slack has called the police on her for trivial reasons (e.g. eating one of his mangos).

Finally, both parties indicated in their testimony that marital intimacy is non-existent.

■ *Discussion*: Pursuant to 16 V.I.C. § 104, this Court may grant a divorce upon the showing of (i) a breakdown of the marriage relationship to the extent that the legitimate objects of matrimony have been

---

[3] To date, all of Mrs. Slack's children have reached majority.

destroyed; and, (ii) there remains no reasonable likelihood that the marriage can be preserved.

From the evidence presented, this Court must first find that the legitimate objects of matrimony have been destroyed. *See Hendry v. Hendry*, 14 V.I. 610, 622 (Terr. Ct. 1978). Upon a determination that there has been a breakdown of the marriage relationship to the extent that the legitimate objects of matrimony have been destroyed, this Court must determine if there is any reasonable likelihood that the marriage can be preserved. 16 V.I.C. § 104. The key issue for this Court to determine is whether there exists any "reasonable possibility of reconciliation" with the "subjective state of mind of the parties toward the relationship, as well as any observable acts or occurrences [that] would be relevant upon this issue." *Hendry*, 14 V.I. at 624-625 (citing *Flora v. Flora*, 166 Ind. App. 620, 337 N.E.2d 846, 850 (1975)).

Turning to the marriage at hand, this Court has sufficient evidence to conclude that there has been a breakdown of the marriage relationship to the extent that the legitimate objects of matrimony have been destroyed. The level of animus demonstrated in the pleadings and through testimony by this couple makes clear to this Court that the relationship completely broke down following the 2013 altercation. Further the couple's disparate views towards spending and the adverse family influences bearing upon the marriage, among other things, support this conclusion.

Further, this Court is convinced that there is no reasonable likelihood that the marriage can be repaired. Both parties admit that the breakdown is irreparable — Mr. Slack, in his petition dated January 16, 2014; and, Mrs. Slack, in her answer and counter-petition dated January 29, 2014. Additionally, the lack of marital intimacy and the couple's behavior — reflecting mutual disdain — shows the break down is irreparable.

*Decision*: There being no dispute of material fact on the issue of the dissolution of the marriage, Petitioner Rudolph Slack is entitled to judgment as a matter of law. Accordingly Petitioner Rudolph Slack's motion for summary judgment is hereby **GRANTED** on the issue of dissolution of the marriage *only*. A decree of divorce absolute will issue on even date.

### 2. Validity and Enforceability of the Agreement

*Facts*: On July 16, 2004, the day before their wedding, the parties signed an Antenuptial Agreement (Agreement). In summary, the

Agreement provides that real, personal, or mixed properties belonging to the parties at the commencement of their marriage shall remain separate throughout the marriage. It further provides that any property acquired by either party during the marriage shall remain separate. Further, any property obtained by both parties, shall be distributed in accordance to the parties' individual contributions. Additionally, upon the death of either party, the other shall waive any spousal right to the deceased's property, thereby requiring that the deceased party's property be distributed as if the marriage had not taken place. Further, if upon the death of either party, the parties are still married and residing together, the surviving spouse shall have a life estate in the deceased party's home. Lastly, neither party shall be responsible for the debt, obligations, charge, or liability acquired by the other party, their estate, or their business.

Mr. Slack claims that the Agreement was validly entered into and is enforceable. Mrs. Slack, on the other hand, claims that the Agreement is invalid and unenforceable because:

1. Mrs. Slack signed the Agreement under duress because upon signing, she feared that if she did not sign the Agreement, the wedding would be cancelled causing her severe embarrassment and humiliation; and the Agreement was entered into the night before the wedding, without prior notice;

2. Mrs. Slack did not have access to independent counsel before signing the Agreement;

3. Mrs. Slack did not receive adequate financial disclosure of Mr. Slack's assets and liabilities prior to signing the Agreement, therefore any property or spousal rights she waived by signing the Agreement was not done knowingly; and

4. The Agreement does not conspicuously display notice of waiver of rights to spousal support, ownership or control of money or property and inheritance rights.

Mr. Slack denies Mrs. Slack's claim that the Agreement was signed under duress. Mr. Slack claims that Mrs. Slack knew about the antenuptial agreement before the eve of their wedding as it was provided to her two weeks before the wedding and he made it clear during their courtship that if he were to marry again, he would require an Antenuptial Agreement so that his assets could be preserved for the benefit of his children upon his death.

372

Mr. Slack acknowledges that he did not provide Mrs. Slack with a list of his assets. However, he counters by claiming that Mrs. Slack was in fact knowledgeable about his finances for the following reasons. According to Mr. Slack, Mrs. Slack regularly checked his bank statements that came in the mail, and went to the bank for him. Mr. Slack also states that while Mrs. Slack was obtaining a divorce from her previous husband, he (Mr. Slack) provided her with financial assistance by paying her rent. Additionally, Mr. Slack argues that Mrs. Slack was aware of his finances because he spent large sums of money during their courtship. For example, per Mr. Slack, the couple's extensive cruises were fully paid for by Mr. Slack and during one of the cruises he funded a charter flight mid-cruise for Mrs. Slack to receive medical treatment.

■ *Discussion*: Antenuptial agreements are recognized in the Virgin Islands. *See Dysart v. Dysart*, 45 V.I. 118, 121 (Terr.V.I. 2002). However, the only statute that discusses antenuptial agreements is the Virgin Islands Statute of Frauds, which requires that such agreements be reduced to writing. *See id.* at 125; 28 V.I.C. § 244. Therefore, this jurisdiction currently does not have any local laws that establish the criteria to be employed in determining an antenuptial agreement's validity and enforceability.

■ Historically, Virgin Islands courts would look to common law as established in the Restatement as a definitive source whenever there was an absence of local law. *See former* 1 V.I.C. § 4. However, the Legislature has repealed 1 V.I.C. § 4, and now uses the Restatement as persuasive authority instead of binding authority when local law is silent on an issue. *Gov't of the Virgin Islands v. Connor*, 60 V.I. 597, 600 (V.I. 2014). Now, when local laws are silent on a particular issue, our courts must complete the following three-pronged analysis as set forth in *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 984-985 (V.I. 2011) (*Banks* analysis). *See Gov't of the Virgin Islands v. Connor*, 60 V.I. 597 (V.I. 2014). The *Banks* analysis requires the court to consider three factors:

> (1) Whether any Virgin Islands courts have previously adopted a particular rule;
> (2) The position taken by the majority of courts from other jurisdictions; and
> (3) Which approach represents the soundest rule for the Virgin Islands.

*Id.* at 600.

As local laws are silent on the issue of the validity and enforceability of antenuptial agreements, a *Banks* analysis follows.

### 1. Whether any Virgin Islands courts have previously adopted a particular rule:

The first reported local case to address the issue of the validity and enforceability of an antenuptial agreement in this jurisdiction is *Dysart v. Dystart*, 45 V.I. 118, 125 (Terr. Ct. 2002). This case established that antenuptial agreements are not against public policy in the Virgin Islands. *Id.* at 126. However, this case did not use Virgin Islands common law to determine the factors that make an antenuptial agreement valid and enforceable, but instead, turned to Arizona law as the agreement in that case was signed in Arizona.[4] Therefore, this issue has not been developed through case law.

### 2. The position taken by a majority of courts from other jurisdictions:

Next, this Court is to consider the position taken by the majority of courts of other jurisdictions at common law. *Tutein v. Arteaga*, 60 V.I. 709, 716 (V.I. 2014).

Historically, antenuptial agreements were considered a violation of public policy on the belief that antenuptial agreements induced divorce. 2 Alexander Lindey & Louis I. Parley, *Lindey and Parley on Separation*

---

[4] *Black v. Powers* is a 2006 case from the Court of Appeals of Virginia which uses Virgin Islands law to establish whether the antenuptial agreement signed in St. Thomas, is valid and enforceable. *See* 48 Va. App. 113, 628 S.E.2d 546. This case cites *Dysart*, but acknowledges that *Dysart* does not provide guidance towards the law of the Virgin Islands, as it uses Arizona law to dissolve the matter. *Black v. Powers*, 628 S.E.2d 546, 557. In *Black*, the Court turned to common law rule as expressed in the Restatement (Second) of Contracts. *Id.* at 558. The Restatement (Second) of Contracts only establishes that antenuptial agreements must fall within the Statutes of Frauds. *Id.* Therefore, an antenuptial agreement is enforceable and binding if it is in writing and signed by the parties. *Id.* The validity of the agreement is presumed once it meets these requirements, and therefore may only be attacked on grounds of fraud, mutual mistake, duress, unconscionability, or the like. *Id.*

Although *Black* attempts to use Virgin Islands law, it does so inappropriately, as 1 V.I.C. § 4 has been repealed, making the Restatement persuasive authority where local law is silent, instead of binding authority. *See Gov't of the Virgin Islands v. Connor*, 60 V.I. 597, 600 (V.I. 2014). Even if *Black* appropriately analyzed the case under Virgin Islands law, it is not a case from a Virgin Islands court, and therefore cannot be used to meet the first prong of the *Banks* analysis, which requires that this Court consider whether Virgin Islands courts have adopted a particular rule on the issue. *See id.*

*Agreements and Antenuptial Contracts*, Section 110.70(2)(b) (2d ed. 2013). Currently, this view of antenuptial agreements has been discredited and such agreements have been accepted nationally through either statutes, or case law. *Id.* at 110.61.

Most states have statutes that govern the validity and enforceability of antenuptial agreements.[5] However, since the Virgin Islands Legislature has not adopted a statute on this issue, our search is limited to jurisdictions that have yet to adopt state statutes to determine the validity and enforceability of antenuptial agreements. *Malloy v. Reyes*, 61 V.I. 163, 177 (V.I. 2014). A review of case law from other jurisdictions revealed that there are eleven states that govern the validity and enforceability of antenuptial agreements through case law.[6]

Of the eleven states, there is little uniformity among the standards used to establish the validity and enforceability of an antenuptial agreement. *See* 2 Alexander Lindey & Louis I. Parley, *Lindey and Parley on Separation Agreements and Antenuptial Contracts*, 110.61 (2d ed. 2013). However, there are four states, namely Alaska, Michigan, South Carolina, and Kentucky, whose courts currently follow the same set of standards when deciding whether an antenuptial agreement is valid and enforceable. *See Brooks v. Brooks*, 733 P.2d 1044, 1049 (Alaska 1987); *Gentry v. Gentry*, 798 S.W.2d 928, 936 (Ky. 1990); *Woodington v. Shokoohi*, 288 Mich. App. 352, 373, 792 N.W.2d 63, 78 (2010); and *Hudson v. Hudson*, 408 S.C. 76, 82, 757 S.E.2d 727, 730 (Ct. App. 2014) reh'g denied (May 22, 2014). The courts in these states consider the following three factors:

> (1) Was the agreement obtained through fraud, duress or mistake, or through misrepresentation or non-disclosure of material facts?

---

[5] Currently, 26 states have adopted the Uniform Premarital Agreement Act (UPAA). Unif. Premarital Agreement Act 1 (1983), http://www.uniformlaws.org/shared/docs/premarital and marital agreements/2012am_pmaa_draft.pdf.

[6] The states are Alabama, Alaska, Kentucky, Maryland, Michigan, Mississippi, Ohio, South Carolina, Vermont, Washington, and Wyoming. *See Hood v. Hood*, 72 So. 3d 666 (2011); *Brooks v. Brooks*, 733 P.2d 1044, 1048 (Alaska 1987); *Brown v. Brown*, 265 S.W.2d 484, 485 (Ky. 1954); *Frey v. Frey*, 298 Md. 552, 562, 471 A.2d 705, 710 (1984); *Woodington v. Shokoohi*, 288 Mich. App. 352, 372, 792 N.W.2d 63, 77 (2010); *McLeod v. McLeod*, 145 So. 3d 1246, 1249 (Miss. Ct. App. 2014); *Johnson v. Johnson*, 2011-Ohio-500, P10 (Ohio Ct. App., Miami County Feb. 4, 2011); *Stork v. First Nat'l Bank*, 281 S.C. 515, 516, 316 S.E.2d 400, 401 (1984); *Bassler v. Bassler*, 156 Vt. 353, 361, 593 A.2d 82, 87 (1991); *In re Marriage of Bernard*, 165 Wn.2d 895, 902, 204 P.3d 907, 911 (2009); and, *In re Marriage of Matson*, 107 Wn.2d 479, 482, 730 P.2d 668, 670 (1986).

(2) Is the agreement unconscionable?

(3) Have the facts and circumstances changed since the agreement was executed so as to make its enforcement unfair and unreasonable?

Although these courts use the same criteria to test the validity and enforceability of antenuptial agreements, their interpretations of the factors differ slightly. For example, in Kentucky, an agreement is unconscionable "if the court determines that it is manifestly unfair and unreasonable." *Blue v. Blue*, 60 S.W.3d 585, 589 (Ky. Ct. App. 2001). South Carolina has defined unconsionability as " 'the absence of meaningful choice on the part of one party due to one-sided contract provisions together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them.' " *Hudson v. Hudson*, 408 S.C. 76, 82, 757 S.E.2d 727, 730 (Ct. App. 2014) reh'g denied (May 22, 2014), citing *Hardee v. Harding*, 355 S.C. 383, 389-90, 585 S.E.2d 501, 504 (2003). Yet, the courts of these states require that the agreement be conscionable at the time the agreement was executed. *Blue v. Blue*, 60 S.W.3d 585, 588 (Ky. Ct. App. 2001); *Woodington v. Shokoohi*, 288 Mich. App. 352, 373, 792 N.W.2d 63, 78 (2010); *Hudson v. Hudson*, 408 S.C. 76, 82, 757 S.E.2d 727, 730 (Ct. App. 2014) reh'g denied (May 22, 2014).

The third factor, regarding the consideration of changed circumstances since the agreement's execution, is also interpreted differently among the courts of these four states. For example, Kentucky's Supreme Court has held that trial courts should consider the parties' respective financial conditions as well as the parties' joint efforts towards the accumulation of marital property at the time of divorce, when deciding if the circumstances have changed since the agreement has been executed. *Blue v. Blue*, 60 S.W.3d 585, 589 (Ky. Ct. App. 2001). The courts in Michigan, on the other hand look at whether the changed circumstances were foreseeable when the agreement was made. *Reed v. Reed*, 265 Mich. App. 131, 144, 693 N.W.2d 825, 835 (2005).

### 3. *The soundest rule for the Virgin Islands*

Mr. Slack argues that *Dysart v. Dysart*, 45 V.I. 118 (Sup. Ct. 2002), recognized the validity of marriage contracts and holds that antenuptial agreements enjoy a presumption of validity. Therefore, per Mr. Slack, this Court should find the Agreement entered into by the parties to be valid and enforceable.

However, courts of other jurisdictions have historically held that antenuptial agreements should not be simply enforced unquestionably. *Scherer v. Scherer*, 249 Ga. 635, 641, 292 S.E.2d 662, 666 (1982) ("In those jurisdictions which have begun enforcing antenuptial agreements in contemplation of divorce, it has been held that such contracts, as others, should not be given carte-blanche enforcement.").

Mrs. Slack argues that this Court should look to the Uniform Premarital Agreement Act for the standard that governs whether the agreement is valid and enforceable. However, this Court cannot adopt a Uniform Act, as only the Legislature of the Virgin Islands can decide to adopt a Uniform Act.

■ The soundest rule for the Virgin Islands would be to conform to the majority common law rule. Conforming to the majority common law rule, as it pertains to establishing the validity and enforceability of an antenuptial agreement, is the soundest rule for the Virgin Islands because the criteria balances the parties' freedom to contract, yet allows the courts to refuse enforcement of the agreement if equity requires. *See Hardee v. Hardee*, 348 S.C. 84, 95, 558 S.E.2d 264, 269 ("We believe this test respects the parties' freedom to contract while allowing the family court to refuse to enforce the agreement if equity so requires and apply it to our analysis here.").

■ Therefore, in order to determine whether the Agreement entered into by the parties is valid and enforceable, this Court will employ the majority rule, which as discussed above, applies the following three-factor test:

(1) Was the agreement obtained through fraud, duress or mistake, or through misrepresentation or non-disclosure of material facts?

(2) Is the agreement unconscionable?

(3) Have the facts and circumstances changed since the agreement was executed so as to make its enforcement unfair and unreasonable?

1. *Was the agreement obtained through fraud, duress or mistake, or through misrepresentation or non-disclosure of material facts?*

Mrs. Slack does not claim that the Antenuptial Agreement in this matter was obtained through fraud, mistake, or through misrepresentation. However, she does claim that the Agreement was obtained through

duress, and non-disclosure of material facts. Therefore, this Court will address Ms. Slack's claim of duress and non-disclosure of material facts.

### Duress

In *Burd v. Antilles Yachting Servs., Inc.*, our Supreme Court referred to the RESTATEMENT (SECOND) OF CONTRACTS, section 175 (section 175) to define duress. 57 V.I. 354, 359 (V.I. 2012). However, in its first footnote, the Supreme Court in *Burd*, while citing to its decision in *Banks*, determined that "under Virgin Islands law, by operation of 1 V.I.C. § 4, the Restatement provisions just quoted, in addition to others that may be applicable under the facts presented, serve as the rules of decision on this matter." *Burd v. Antilles Yachting Servs., Inc.*, 57 V.I. 354, 359 (V.I. 2012); citing *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 973 (V.I. 2011). However, such automatic and mechanical application of various Restatement provisions, without determining whether it is the soundest rule for the Virgin Islands is exactly what *Banks* warned against. *Banks v. Int'l Rental & Leasing Corp.* 55 V.I. 967, 980 (V.I. 2011) ("For the forgoing reasons, we conclude that 1 V.I.C. § 4 does not incorporate all of the Restatement provisions as if they were actual statutory text . . ."); *see also Gov't of the Virgin Islands v. Connor*, 60 V.I. 597, 602 (V.I. 2014) ("As we have explained, mechanistic and uncritical reliance on the Restatements has the effect of inappropriately delegating the judicial power of the Virgin Islands to the American Law Institute and to the governments of other jurisdictions, without any regard for determining the best rules for the Virgin Islands.").

In the *Gov't of the Virgin Islands v. Connor*, the Supreme Court found that the Superior Court committed an error "by citing to *Banks* yet nonetheless failing to perform a *Banks* analysis." 60 V.I. 597, 602 (V.I. 2014). In *Connor*, the Supreme Court noted that they have adopted a practice of reconsidering its pre-*Banks* decisions which were based solely on former 1 V.I.C. § 4, and therefore, the Superior Court "should not be foreclosed from departing from those holdings in an appropriate case, provided that it thoroughly explains the reasoning for its decision." *Id.* at 605. Although *Burd* is a post-*Banks* case and binding precedent upon this Court, its mechanical application of former 1 V.I.C. § 4, without further consideration to justify its continued reliance on the Restatement, makes it an appropriate case to be reconsidered.

Although *Connor* indicates that this Court is not bound to precedent which mechanically relies on former 1 V.I.C. § 4, this Court finds it unnecessary to depart from the holding in *Burd. See id.* A review of case law from other jurisdictions reveals that a majority of jurisdictions define duress by way of adopting the RESTATEMENT (SECOND) OF CONTRACTS, section 175 verbatim, or by implementing a rule similar to it. These jurisdictions include, but are not limited to, Colorado, Iowa, Pennsylvania, New York, Washington D.C., Utah, Arizona, Alaska, Hawaii, and Connecticut. *See Vail/Arrowhead, Inc. v. District Court*, 954 P.2d 608, 613 (Colo. 1998) (Section 175 recognizes both the older categories of duress and the modem extensions.); *Miller v. Miller*, 2002 Iowa App. LEXIS 1103, *6 (Iowa Ct. App. Oct. 16, 2002) (Stating that Iowa courts follow section 175's rule concerning duress); *Pettinger v. Serino*, 1996 Pa. Dist. & Cnty. Dec. LEXIS 57, 36 Pa. D. & C.4th 324, 327 (Pa. C.P. 1996) (Courts of Pennsylvania have turned to section 175 to define duress.); *Naqvi v. Computers Assocs. Int'l*, 2008 N.Y. Misc. LEXIS 7512, *7 (N.Y. Sup. Ct. 2008) (New York courts use the no reasonable alternative standard when determining the gravity of the threat.); *Osborne v. Howard Univ. Physicians, Inc.*, 904 A.2d 335, 339 (D.C. 2006) (to set aside a contract under duress, the party must have sufficient proof of (1) an improper threat and (2) the lack of a reasonable alternative); *Andreini v. Hultgren*, 860 P.2d 916, 921, 222 Utah Adv. Rep. 3 (1993) (adopts the section 175 and 176 so to assume the now prevalent view); *US Life Title Co. v. Gutkin*, 152 Ariz. 349, 357, 732 P.2d 579 (1986) ("Duress is an act or threat that results in the preclusion of the exercise of free will and judgment."); *International Paper Co. v. Whilden*, 469 So. 2d 560, 563 (Ala. 1985) (Economic duress is not proven by a wrongful act alone, but there must also be proof of having no reasonable alternative.); *Standard Fin. Co. v. Ellis*, 3 Haw. App. 614, 622, 657 P.2d 1056 (1983) (stating that Hawaii has adopted the rule under section 175 to define duress); *Jenks v. Jenks*, 232 Conn. 750, 753, 657 A.2d 1107 (1995) (To conclude that the stipulated judgment was entered into under duress, the fact finder must determine that the misconduct of one party induced the party seeking to avoid the stipulated judgment to manifest assent, as he had no reasonable alternative.).

■ The RESTATEMENT (SECOND) OF CONTRACTS, section 175 has been previously applied by a Virgin Islands court, e.g. *Burd v. Antilles Yachting Servs., Inc.*, 57 V.I. 354, 359 (V.I. 2012), and it represents the majority

common law rule among other jurisdictions. Therefore, the soundest rule for the Virgin Islands would be follow the RESTATEMENT (SECOND) OF CONTRACTS, section 175 when determining whether duress existed at the execution of an antenuptial agreement.

Mrs. Slack makes two claims of duress. First, Mrs. Slack claims that she feared that had she refused to sign the Agreement, Mr. Slack would have cancelled the wedding, thereby causing her severe embarrassment and humiliation. Therefore, Mrs. Slack argues that she was under duress when she signed the Agreement.

Second, Mrs. Slack argues that she was not provided with the Agreement until the moment she signed it, which per Mrs. Slack, constitutes duress. Under the RESTATEMENT (SECOND) OF CONTRACTS, Section 175, duress occurs "if a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." Therefore, Mrs. Slack will have to prove that her manifestation of assent was induced by an improper threat made by Mr. Slack, and that such threat left her no other reasonable alternative.

### 1. *Canceling the wedding*:

Per Mrs. Slack, she signed the Agreement only out of fear that if she refused to agree to sign the Agreement, the wedding would have been cancelled only hours prior to the ceremony, which would have caused extreme embarrassment and humiliation. This Court finds that canceling or postponing the wedding ceremony, although upsetting, is an entirely reasonable alternative to signing the Antenuptial Agreement. Similarly *see Miller v. Miller*, 2002 Iowa App. LEXIS 1103, *7 (Iowa Ct. App. Oct. 16, 2002) (Where the wife alleges that she signed the antenuptial agreement under duress because the husband threatened to cancel the wedding, the court found that canceling the wedding is a reasonable alternative to entering an antenuptial agreement.).

### 2. *Untimely presentation of the Agreement*

Mrs. Slack argues that she was not provided with the Agreement until the evening before the wedding. To Mrs. Slack, this untimely presentation of the Agreement constitutes duress. Mr. Slack argues that Mrs. Slack was well aware of the Agreement prior to signing it because, from the commencement of their relationship, he made it clear to her that that if he

were to marry again, he would require his intended bride to sign an antenuptial agreement. Secondly, Mr. Slack argues that although the Agreement was signed the evening before their wedding, his attorney provided Mrs. Slack with a copy of the Agreement two weeks before their wedding.

Whether Mrs. Slack was given a copy of the Agreement moments prior to signing it, or two weeks prior, is a fact that is in dispute. However, this Court questions whether this is a material fact. As discussed above, a material fact is one that can change the outcome of a case, under the government law. *Ferris v. V.I. Indus. Gases. Inc.*, 23 V.I. 183 (D.V.I. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)).

However, this Court is mindful that all reasonable inferences from evidence are viewed in favor of the non-moving part, when deciding whether there is a disputed issue of material fact. *See In re Tutu Water Wells Contamination Litig.*, 78 F. Supp. 2d 456, 460, 42 V.I. 278 (D.V.I. 1999). Viewing the evidence in favor of Mrs. Slack, notwithstanding Mrs. Slack's receiving the Agreement moments prior to execution, this Court still finds canceling the wedding to be a reasonable alternative to entering the Agreement with no notice.

■ This Court finds that Mrs. Slack was not under duress, when she manifested her assent to the Agreement, since canceling the wedding was a reasonable alternative to entering the contract in either instance.

### Non-Disclosure of Material Facts

■ In this action, the material facts that the parties must disclose to each other are their assets and property interests obtained prior to entering the marriage, so that the parties fully understand the extent of the property and spousal rights waived, once they sign the Agreement. *See In re Estate of Benker*, 416 Mich. 681, 689, 331 N.W.2d 193 (1982) (Antenuptial agreements give rise to a special duty of disclosure, so that the parties are fully informed of their rights and the extent of the waiver of such rights before they enter into the agreement).

Mrs. Slack testified that neither party made financial disclosures to the other, before signing the Agreement. Mr. Slack agrees that he did not provide Mrs. Slack with a list of his assets, nor was one attached to the Agreement. However, Mr. Slack argues that Mrs. Slack was well aware of

his finances before she signed the Agreement for the following reasons. First, Mrs. Slack would regularly check his bank statements that came through the mail, and as a result, according to Mr. Slack, Mrs. Slack knew the extent of his finances. Second, during one of the couple's cruises, Mr. Slack chartered a flight mid voyage to transport Mrs. Slack to land and back so that Mrs. Slack could receive medical attention. Third, prior to their marriage, Mr. Slack assisted her with her rent while she was obtaining a divorce from her previous husband. Lastly, before the marriage, Mr. Slack transferred a valuable Certificate of Deposits to Mrs. Slack's.

Mr. Slack also argues that because Mrs. Slack had been married three times before, she is familiar with divorce proceedings and understands distribution of property in such actions. In fact, during the hearing, Mr. Slack stated that during her last divorce, Mrs. Slack purchased a house under her mother's name instead of her own, so that she could remove the home from the marital estate for distribution purposes. Therefore, according to Mr. Slack, although he did not provide Mrs. Slack with a list of his assets, she was relationship savvy and aware of his finances prior to signing the Agreement. Hence, per Mr. Slack, she knowingly entered into the Agreement.

 Although a list of assets was not exchanged between the parties prior to the signing of the Agreement, Mr. Slack's testimony indicates that both parties had some understanding of each other's financial affairs. However, this understanding was limited. The fact that Mrs. Slack was aware of the information in Mr. Slack's bank statements, went on lavish vacations with him, obtained financial assistance from Mr. Slack through her last divorce, and had a Certificate of Deposit transferred to her name, does not indicated that Mrs. Slack entered into the Agreement fully aware of Mr. Slack's assets. Instead, it indicates that Mrs. Slack was aware of the information that Mr. Slack allowed her to become knowledgeable of — the *degree* of Mr. Slack's wealth was unknown to Mrs. Slack. Therefore, in so far as neither party provided the other with full information regarding their finances, the parties were not sufficiently aware of each other's assets to make a completely knowing and intelligent waiver of property and spousal rights.

*Decision*: This Court finds that Mrs. Slack was not under duress, when she manifested her assent to the Agreement, since canceling the wedding was a reasonable alternative to entering the contract. Further, since the

parties entered into this agreement without a *full* disclosure of financial assets, this Court finds that the Antenuptial Agreement entered into by the parties is invalid and unenforceable.

In so far as Mrs. Slack failed to satisfy the first prong of the three-factor test for the validity and enforceability of an antenuptual agreement, this Court need not address the second and third factors.

Accordingly, Mr. Slack's motion for summary judgment as it relates to the Antenuptial Agreement is **DENIED**.

**THEREFORE**, it is hereby,

**ORDERED** that Petitioner Rudolph Slack's Motion for Summary Judgment is **GRANTED** in part, as it relates to the dissolution of the marriage; and **DENIED** in part, as it relates to the validity and enforceability of the Antenuptial Agreement signed by the parties;

**ORDERED** that a copy of this Order be served upon the parties and their counsel.